Eugene LOBATO; Zack Bernal; Gabrielita Adeline Espinosa; Edward Espinosa; Pete E. Espinosa, Jr.; Corpus Gallegos by and through his conservator Yvette Gallegos; Gloria Gallegos; Rupert Gallegos; Raymond Garcia; Charlie Jacquez, Jr.; Adolph J. Lobato; Bonifacio "Bonnie" Lobato by and through his conservator Teresa Lobato; Carlos Lobato; Emilio Lobato, Jr.; Jose F. Lobato; Presesentacion J. Lobato; Gloria Maestas; Norman Maestas; Robert "Bobby" Maestas; Raymond J. Maestas; Eugene Martinez; Mark Martinez; Agatha Medina; Gilbert "Andres" Montoya; Shirley Romero Otero; Eppie Quintana; Lucille Samelko; Arnold Valdez; Ervin L. Vigil; Larry J. Vigil; Michael J. Vigil; Billy Alire; Robert Atencio; Frances D. Berggran–Buhrles; Jose Fred Carson; Elmer Manuel Espinosa; Margurito Espinosa; Moises Gallegos; Ruben Gallegos; Richard J. Garcia; Manuel Gardunio; Ruben Herrara; Jeffrey Jacquez; Adelmo Kaber; Crucito Maes; Daniel Martinez; David Martinez; Jesse Martinez; Leonardo Martinez; Rosendo

Martinez; Solestiano Martinez; Alfonso Medina; Gilbert Medina; Leandardo Medina; Loyola Medina; Marvin Medina; Orry Medina; Raymond N. Medina; Rudy Montoya; Gurtrude C. Olivas; Eppy Wayne Quintana; Robert Romero; Shirley Romero; Anthony Sanchez; Bonnie Sanchez; Eugene Sanchez; Evan Sanchez; James Sanchez; Jose G. Sanchez; Rufino Sanchez; S.R. Sanchez; Vernon Sanchez; Ronald A. Sandoval; Elesam Santistevan; Daniel Segura; Floyd R. Solan; Carolyn Taylor; Sam Valdez; Martha Vialpondo; Joe P. Vigil; and Walter Vigil, Plaintiffs–Appellants and Cross–Appellees,

v.

Zachary TAYLOR, as executor of the Estate of Jack T. Taylor, Jr., Deceased, and The Taylor Family Partnership, Defendants–Appellees and Cross–Appellants,

and

J. Hoy Anderson; Marvin Lavern Stohs; Edythe Kelly Stohs; Charles W. Gelderman; William F. Phinney; Harlan A. Brown; Dena F. Fuhrmann; Jimmy C. Crook; Freeland D. Crumley; Joseph P. Campisi; Hugh R. Denton; Robert Paul Resteli; Eugene J. Kafka; Avis M. Anderson; Clifford R. Jenson; Don W. Jacobs; Raymond E. Gauthier; Francis P. Heston; and Howard G. Frailey; Defendants–Appellees.

No. 98CA1442.

Colorado Court of Appeals,
Div. IV.

May 11, 2000.

Certiorari Granted Dec. 4, 2000.*

* Justice COATS does not participate.

Goldstein & Dodge, L.L.P., Jeffrey A. Goldstein, Denver, Colorado; David Mar-

tinez, Denver, Colorado; Kelly/Haglund/Garnsey & Kahn, LLC, Norman D. Haglund, Denver, Colorado; Walters & Joyce PC, Julie T. Waggener, Denver, Colorado; Otten, Johnson, Robinson, Neff & Ragonetti, PC, William F. Schoeberlein, Denver, Colorado; Robert Maes, Denver, Colorado; Don, Hiller & Galleher, P.C., Watson W. Galleher, Denver, Colorado; Elisabeth Arenales, Denver, Colorado, for Plaintiffs–Appellants and Cross–Appellees.

Wolf & Slatkin, P.C., Albert B. Wolf, Raymond P. Micklewright, Jonathan L. Madison, Denver, Colorado, for Defendants–Appellees and Cross–Appellants.

Federico Cheever, Denver, Colorado, for Amicus Curiae Colorado Hispanic Bar Association.

David M. Pantos, Denver, Colorado, for Amicus Curiae National Lawyers Guild.

Miller, Lane, Killmer & Greisen, LLP, David H. Miller, Denver, Colorado, for Amicus Curiae American Civil Liberties Union Foundation of Colorado.

Teresa Casillas, Denver, Colorado, for Amici Curiae National Chicano Human Rights Council and International Indian Treaty Council.

David J. Stephenson, Jr., Denver, Colorado, for Amicus Curiae Rocky Mountain Human Rights Law Group.

Opinion by Judge VOGT.

The primary issue in this case is whether plaintiffs, owners of property in Costilla County, Colorado, have rights to use defendants' property for grazing, gathering firewood, harvesting timber, fishing, hunting, and recreation. After a bench trial, the trial court concluded that plaintiffs had no such rights and accordingly dismissed their claims. Plaintiffs have appealed the judgment of dismissal and related orders in the trial court proceedings. Defendants cross-appeal, challenging the trial court's denial of attorneys' fees and other rulings. We affirm.

The property at issue here, known as the Taylor Ranch, consists of some 80,000 acres of mostly mountainous land in southern Colorado. It is part of the one million acre Sangre de Cristo land grant, which was awarded by the Mexican government to Narcisco Beaubien and Stephen Luis Lee in 1844, included in the territory ceded to the United States under the Treaty of Guadalupe Hidalgo in 1848, and confirmed by Congress in 1860 as the property of Charles (Carlos) Beaubien. The history of the Sangre de Cristo grant is relevant to various issues in this case and is discussed in detail in Sections I and II, below.

Beginning in the mid–1800s, settlers in the area, including plaintiffs' ancestors and predecessors in title, grazed cattle and sheep, harvested timber, gathered firewood, fished, hunted, and engaged in recreation on the Taylor Ranch property, which was then unfenced land.

In 1960, Jack Taylor purchased the property. That same year, Taylor filed a petition in the United States District Court for the District of Colorado to register title in his land as provided for in Colorado's Torrens Title Registration Act, § 38–36–101, et seq., C.R.S.1999. The application listed over three hundred individuals as interested parties and referred to others claiming an interest in the property, including persons asserting claims to "settlement rights" by virtue of an 1863 document known as the Beaubien document.

The district court determined that the defendants had no rights in Taylor's property and entered a Final Decree of Confirmation of Title and Registration pursuant to the Torrens Act. The Tenth Circuit affirmed. *Sanchez v. Taylor*, 377 F.2d 733 (10th Cir. 1967).

After purchasing the property, Taylor had begun fencing the land and cutting off public access to it. In 1981, plaintiffs, on behalf of themselves and a class of heirs and successors in interest to the original settlers of the Sangre de Cristo grant, filed a quiet title action in Costilla County District Court against Taylor and others who had interests in the property. Citing Mexican law and custom as well as representations made by Charles Beaubien in the Beaubien document, the complaint alleged that the Taylor Ranch was subject to community rights and uses for grazing, lumber, water, pasturing, hunting,

and recreation, and that Taylor was violating plaintiffs' rights by fencing off the property and barricading the roads.

In 1985, defendants moved for summary judgment, arguing that plaintiffs' claims were barred under principles of res judicata and stare decisis because their contentions concerning their rights to the property had been litigated and rejected in Taylor's 1960 Torrens action. The trial court entered summary judgment but denied defendants' request for attorney fees. A division of this court affirmed. *Rael v. Taylor*, 832 P.2d 1011 (Colo.App.1991).

The supreme court granted certiorari and, in *Rael v. Taylor*, 876 P.2d 1210 (Colo.1994), affirmed the denial of defendants' request for fees but reversed on the res judicata issue, concluding that the division had erred by determining the question of res judicata without first deciding whether notice adequate to satisfy the requirements of due process had been provided in the 1960 Torrens action. The supreme court directed that, on remand, the trial court was to determine whether Taylor had exercised reasonable diligence in identifying and serving persons with an identifiable interest in the property in the original Torrens action.

After remand to the court of appeals for determination of additional issues concerning statutes of limitations (*see Rael v. Taylor*, (Colo.App. No. 87CA0658, Mar. 9, 1995) (not selected for publication)), the cause was returned to the trial court for further proceedings.

A bench trial was held on the res judicata/due process issues in September 1997. At the conclusion of that trial, the court ruled that some of the named plaintiffs had an identifiable interest in defendants' property, could reasonably have been ascertained and served in the 1960 Torrens action, were not properly served, and therefore were not barred under res judicata principles from pursuing their claims. The court dismissed the claims of the majority of the plaintiffs, concluding that there had been no violation of their right to notice in the Torrens action. It also denied plaintiffs' motion for class certification.

In May 1998, the case proceeded to trial on the merits of the claims of the remaining plaintiffs. Prior to the merits trial, the court entered summary judgment against plaintiffs on their claims to rights in defendants' property to the extent those claims were based on Mexican law and custom and international law. Following the trial, the court dismissed plaintiffs' remaining claims. It also denied defendants' motion for attorneys' fees.

## ISSUES ON APPEAL

Plaintiffs challenge the trial court's rulings on the due process and class certification issues, the court's cost award, and its rulings on the merits of their claims. Because we conclude that the trial court did not err in dismissing plaintiffs' claims on the merits, we do not decide the issues raised by plaintiffs relating to due process or class certification. Plaintiffs have not suggested that any of the individuals who were dismissed following the due process trial had theories of relief available to them that were not available to those plaintiffs whose claims were tried on the merits. Thus, any errors in the trial court's rulings on due process or class certification would not change the result reached here.

Before turning to plaintiffs' specific contentions, addressed in Sections I–III, below, we consider briefly the nature of the property rights they claim.

The trial court characterized these rights as "profits a prendre," which is the term used at common law to refer to rights to take a part of the soil or produce of the land of another. *See Alexander Dawson, Inc. v. Fling*, 155 Colo. 599, 396 P.2d 599 (1964).

Profits a prendre include rights to pasture (that is, the right to allow one's animals to graze on the lands of another), to fish, to hunt, and to remove wood. Profits a prendre may be appurtenant to other land, with the land to which the right appertains being the dominant tenement and the land from which the profits are taken being the servient tenement, or they may exist in gross—*i.e.*, held and enjoyed by an individual or party distinct from any ownership of land. *See generally 8 Thompson on Real Property* § 65.02(b)(Thomas ed.1994); 3 *Tiffany Real*

*Property* §§ 839—845 (3d ed. 1939 & 1999 Cum.Supp.).

■ Like an easement, a profit a prendre is a type of servitude, that is, an encumbrance consisting of a right to the limited use of a piece of land without the possession of it. *Black's Law Dictionary* 1373 (7th ed.1999). However, as discussed below, profits and easements are not treated identically for all purposes.

Plaintiffs rely on three different bases to support their claims to rights in defendants' property. The trial court rejected the first on summary judgment, and the second and third after trial on the merits. We address each in turn.

## I. *Rights Arising Prior to 1860 Based on Mexican Law and Custom*

Plaintiffs contend that the trial court erred in granting summary judgment on all claims based on rights purportedly acquired prior to 1860. We disagree.

We review a summary judgment *de novo*, applying the same standards that govern the trial court's determination. Summary judgment is warranted only when there is a clear showing that no genuine issue exists as to any material fact and that the moving party is entitled to judgment as a matter of law. All doubt as to the existence of a triable factual issue must be resolved against the moving party, and the non-moving party is entitled to the benefit of all favorable inferences that may be drawn from the facts. *Churchey v. Adolph Coors Co.,* 759 P.2d 1336 (Colo.1988).

### A. *Factual background*

In 1843, Narcisco Beaubien and Stephen Luis Lee petitioned the Mexican governor of New Mexico for a grant of land (the Sangre de Cristo grant), eventually determined to consist of some one million acres, located primarily in what is now south-central Colorado. The petition was granted. After the grantees were killed in 1847, Narcisco Beaubien's father, Charles Beaubien, inherited his son's undivided one-half interest in the property and purchased the remaining interest from Lee's estate.

In 1848, the United States and the Republic of Mexico entered into the Treaty of Guadalupe Hidalgo, ending hostilities between the two nations. The treaty provided, in relevant part, that the rights of Mexicans to property in the lands ceded to the United States would be "inviolably respected."

In order to establish a process for determining land claims within the New Mexico portion of the ceded territories, Congress gave the surveyor general of the Territory of New Mexico the duty "to ascertain the origin, nature, character, and extent of all claims to lands under the laws, usages, and customs of Spain and Mexico" and to report to Congress on the validity of such claims, so that Congress could take action to confirm bona fide grants and give effect to the Treaty of Guadalupe Hidalgo. Act of July 22, 1854, Ch. 103, 10 Stat. 308 (1854).

In 1856, following a trial, the surveyor general concluded that the Sangre de Cristo grant was "a positive one, without any subsequent conditions attached ... a good and valid [grant] ... and that a legal title vests in Charles Beaubien to the land." The surveyor general recommended that the grant be confirmed by Congress. Upon that recommendation, Congress approved the Sangre de Cristo grant and confirmed title in Beaubien in 1860. Act of June 21, 1860, Ch. 167, 12 Stat. 71 (1860) (the Act of Confirmation). A patent issued in 1880.

In *Tameling v. U.S. Freehold & Emigration Co.,* 93 U.S. 644, 23 L.Ed. 998 (1876), the United States Supreme Court affirmed a decision of the supreme court of Colorado territory (*Tameling v. U.S. Freehold Land & Emigration Co.,* 2 Colo. 411 (1874)) that rejected a challenge to the validity of the original grant to Beaubien's predecessors. Noting that the 1860 Act of Confirmation confirmed the grant as absolute and unconditional, the Court held that that Act was binding on the courts ("[T]he invalidity of the grant ... was matter for the consideration of Congress; and we deem ourselves concluded by the action of that body"). *Tameling v. US Freehold & Emigration Co., supra,* 93 U.S. at 663, 23 L.Ed at 1003.

*Tameling* was subsequently relied on by the Tenth Circuit in *Sanchez v. Taylor, supra,* in affirming the lower court's ruling, in Taylor's original Torrens action, that any rights which the owners of land near Taylor's property might have had under Mexican law and the Treaty of Guadalupe Hidalgo were extinguished by the Act of Confirmation in 1860.

### B. Proceedings in the Trial Court

Prior to the May 1998 merits trial, defendants sought summary judgment on various issues. As pertinent here, defendants argued that, in light of *Tameling* and *Sanchez,* principles of stare decisis required the trial court to rule as a matter of law that any rights that plaintiffs' predecessors may have had under the original grant from Mexico were extinguished by the 1860 Act of Confirmation. Plaintiffs opposed summary judgment by providing the court with expert reports and other materials which they claimed established that the 1843 grant petition of Narcisco Beaubien and Stephen Luis Lee promised rights to future settlers which were recognized by the surveyor general and not extinguished by the 1860 Act of Confirmation.

The trial court granted summary judgment on this issue. It determined that, by virtue of the Act, confirmation was "absolute and unconditional" in Charles Beaubien. It then concluded that, given the Supreme Court's holding in *Tameling* that the Act was final and conclusive as to the nature and validity of the grant and not subject to judicial review, the doctrine of stare decisis required the conclusion that "any purported rights that might [have] existed ... were extinguished by the 1860 Confirmatory Act ... and if the confirmation of title was contrary to the treaty provisions, the question was political, not judicial."

### C. Analysis

■ On appeal, plaintiffs and their amici argue, as they did in the trial court, that the two original grantees promised to settle the grant in accordance with Mexican law and custom; that Mexican law and custom recognized that such settlers had certain communi-

ty rights or settlement rights; that, in accordance with the Treaty of Guadalupe Hidalgo, those rights were entitled to protection; and that the trial court's contrary conclusion violates both the treaty and international law. We are unpersuaded.

We note initially that, although plaintiffs' experts testified that such rights should be inferred by reference to Mexican law and custom, the relevant documents themselves contain no references to property rights of anyone other than Narcisco Beaubien, Stephen Luis Lee, and their heirs and successors in title. Nor do they contain any language expressly indicating that the original petitioners, or the Mexican government that granted the petition, intended to ensure that the settlers would have such rights.

While the 1843 petition references the petitioners' intent to promote and encourage settlement, it also states that the petitioners were seeking a decree "which will ensure to us our legal title [to the land] and prevent any one from disturbing us." Similarly, the grant from the Mexican governor awarded the petitioners "the personal and perfect possession which they solicit, serving as a title to them, their children and successors."

On its face, this language is inconsistent with an intent to grant enforceable property rights to other parties. Moreover, as noted above, the surveyor general's report recommended confirmation of Charles Beaubien's title in equally absolute terms, and did not suggest that there were any limitations on that title.

We also note that the Sangre de Cristo grant at issue here is significantly different from the "Baca grant" that was considered in *American Water Development, Inc. v. City of Alamosa,* 874 P.2d 352 (Colo.1994), on which plaintiffs rely. In that case, the Mexican government had not only granted title to the tract to an individual, Luis Maria Cabeza de Baca, but had also expressly recognized the rights and privileges of settlers upon the grant. Further, the surveyor general had recommended confirmation of title both in the settlers and in the Baca heirs, leaving to the respective claimants the right of adjusting their conflicting claims in the courts.

The 1860 Act of Confirmation did not confirm title in Baca, as it did in Beaubien for the Sangre de Cristo grant, but instead granted Baca's heirs the right to select other lands in the public domain.

The fact that the Mexican government expressly granted rights to settlers on the Baca grant, and that the surveyor general and Congress expressly acknowledged those rights, supports the conclusion that a grant of such rights to the settlers on the Sangre de Cristo grant should not be inferred in the absence of any similar express language.

Moreover, even if the surveyor general and the 1860 Congress failed to recognize rights which the settlers on the Sangre de Cristo grant might have had under Mexican law, any right to enforce these in the courts no longer exists. As the trial court recognized, *Tameling* established the finality of the 1860 Act confirming title in Beaubien and foreclosed judicial review of claims based on rights that assertedly arose before the date of the Act.

Plaintiffs argue that *Tameling* is distinguishable because John Tameling was not seeking, as they are, to enforce rights under Mexican law but, instead, was invoking Mexican law as a basis for challenging the validity of the title held by U.S. Freehold, one of Beaubien's successors. We do not view this distinction as sufficient to permit us to disregard *Tameling*'s prohibition of judicial review of challenges to the validity of titles confirmed by Congress as absolute and unconditional.

Plaintiffs also argue that the 1860 Act of Confirmation did not extinguish their claims because it relinquished only the rights of the United States government. However, notwithstanding language to that effect in the Act itself, we find it significant that both the Supreme Court in *Tameling* and the Tenth Circuit in *Sanchez* construed the Act as extinguishing claims of private parties, not simply claims of the United States. Indeed, in *Sanchez,* the Tenth Circuit expressly considered and rejected the argument, made by the defendants in Taylor's original Torrens action, that the 1860 Act of Confirmation did not affect the adverse rights of parties other than the United States. We are not persuaded to reach a contrary conclusion here.

In sum, plaintiffs have not established a basis for distinguishing *Tameling* and *Sanchez* or for concluding that they had enforceable rights to defendants' property that survived the 1860 Act of Confirmation. Accordingly, the trial court did not err in entering summary judgment on this issue.

II. *Rights Based on the Beaubien Document*

We likewise conclude that the trial court did not err in rejecting, after a trial on the merits, plaintiffs' contention that they had enforceable use rights in defendants' property by virtue of the Beaubien document of 1863.

A. *Factual Background*

Prior to 1860, Charles Beaubien had sold numerous small parcels of land to various settlers who had come to the area, and had conveyed other property interests as well. For example, in 1856, Beaubien leased a parcel of land to the U.S. Army for twenty-five years, and included in the lease a statement that the U.S. Government was to have "the further privileges, during the occupancy of said [Army Post], to pasture, cut grass, timber and firespace [sic] wood, upon any adjacent land belonging to us."

On May 11, 1863, Beaubien executed a document written in Spanish (the Beaubien document) setting forth certain rights and privileges to be had by settlers residing in towns located within the boundaries of the grant. In the translation relied on by plaintiffs, the document provides in pertinent part as follows:

> Plaza of San Luis de la Culebra, May 11, 1863.

> It has been decided that the lands of the Rito Seco remain uncultivated for the benefit of the community members (*gente*) of the plazas of San Luis, San Pablo and Los Ballejos and for the other inhabitants of these plazas for pasturing cattle by the payment of a fee per head, etc. and that the water of the said Rito remains partitioned among the inhabitants of the same

plaza of San Luis and those from the other side of the vega who hold lands almost adjacent to it as their own lands, that are not irrigated with the waters of the Rio Culebra. The vega ... will remain for the benefit of the inhabitants of this plaza and those of the Culebra as far as above the plaza of Los Ballejos.... Those below the road as far as the narrows will have the right to enjoy the same benefit.... [No one may] place any obstacle or obstruction to anyone in the enjoyment of his legitimate rights.... Likewise, each one should take scrupulous care in the use of water without causing damage with it to his neighbors nor to anyone. According to the corresponding rule, all the inhabitants will have enjoyment of benefits of pastures, water, firewood and timber, always taking care that one does not injure another....

The document, signed by Beaubien and two witnesses, was recorded in the grantor/grantee index of Costilla County.

After Beaubien died in 1864, his heirs conveyed all the unsold Sangre de Cristo grant property to William Gilpin. The instrument of conveyance included a statement that "certain settlement rights before then conceded by said Charles Beaubien ... shall be confirmed by said William Gilpin."

Between 1864 and 1960, Gilpin and his successors in interest sold most of the remaining property. In 1960, when Jack Taylor purchased one of the few remaining large parcels of undivided and unfenced land, his deed contained the following statement: "All of the land hereby conveyed being subject to rights of way of record and ... also subject to claims of the local people by prescription or otherwise to rights to pasturage, wood, and lumber and so-called settlement rights in, to, and upon said land...."

In its opinion affirming the district court's ruling in Taylor's Torrens action, the Tenth Circuit held that the Beaubien document did not evidence an intent to dedicate or grant the privileges claimed by the defendants. *Sanchez v. Taylor, supra.*

### B. *Trial Court Proceedings*

Defendants sought summary judgment on this issue prior to the merits trial. They argued that, as a matter of law, the 1863 Beaubien document created no rights to the Taylor Ranch property. Finding that this issue was "the crux of the litigation," and that there were many disputed issues of fact to be resolved by the trier of fact, the trial court denied summary judgment.

This claim was the primary focus of the merits trial in May 1998. Plaintiffs offered testimony of lay and expert witnesses in support of their contention that the Beaubien document created rights to the property that were enforceable by the plaintiffs. Defendants' only witness was Zachary Taylor, executor of the estate of his father, Jack Taylor, and manager of the Taylor Ranch.

Following the trial, the court made written findings and conclusions and entered judgment in favor of defendants. As pertinent to this issue, the court found that: (1) plaintiffs' predecessors in title grazed cattle and sheep, harvested timber, gathered firewood, fished, hunted, and recreated on defendants' land from the 1800s until the land was acquired by Jack Taylor in 1960; (2) none of the land was fenced prior to 1960, and plaintiffs were never denied access to the land for the uses enumerated above; and (3) the chain of title of all land now owned by plaintiffs and defendants extended from Carlos Beaubien in 1863.

The court concluded that the Beaubien document, which it found "not an ambiguous paper on its face as it pertains to the land now owned by [defendants]," was not a document of conveyance of any use rights on defendants' land. In support of that conclusion, the court stated that: (1) the document did not mention fishing, hunting, or recreating, which, as profits a prendre, had to be expressed in writing to vest; (2) none of the locations mentioned in the document were on defendants' land; (3) the 1856 lease from Beaubien to the U.S. Government showed that Beaubien knew how to convey use rights or profits a prendre; (4) language in Jack Taylor's deed stating that he took the property "subject to" claims of the local people did not refer to any right, but only that the

plaintiffs claimed to have a right; and (6) plaintiffs had not borne their burden of proving that Beaubien intended to do anything with the property except keep it for himself.

## C. *Analysis*

Plaintiffs state on appeal that, because three of the rights they claim (hunting, fishing, and recreation) are not expressly granted in the Beaubien document, they are not asserting claims to these rights under the document but, instead, are claiming these rights by prescription. They maintain, however, that the Beaubien document was sufficient to convey enforceable rights to pasture, firewood, and timber on defendants' property, and that the trial court erred in concluding otherwise. We do not agree.

1. *The Beaubien document did not satisfy the requirements of Colorado law in 1863 for validly conveying interests in real property.*

■ We note initially that, although much of the focus of plaintiffs' argument on this issue is on Mexican law and custom, the validity and effect of the Beaubien document itself is determined by Colorado law. *See De Mares v. Gilpin,* 15 Colo. 76, 24 P. 568 (1890) (plaintiff's rights to land in Colorado were determinable under the laws of Colorado; thus, she could not rely on her disability as a married woman under the customs and law of New Mexico to excuse her failure to prosecute her claim to the land); Restatement (Third) of Property: Servitudes § 2.1, at 4 (Tent. Draft No. 1, 1989) ("to create a servitude, a contract or conveyance must meet local law requirements for contracts or conveyances involving interests in land").

Under the law in effect in Colorado territory in 1863, a document conveying any interest in real property had to meet certain formal requirements, including the requirement that it contain "the christian and surnames of the ... grantees ... and ... an accurate description of the premises, or the interest in the premises intended to be conveyed." General Laws of the Territory of Colorado, Act Concerning Conveyances of Real Estate, § 2 (1861).

The Beaubien document does not give the "christian and surnames" of the grantees, but simply refers generally to the "community members" and "inhabitants" of the villages. Moreover, the document does not identify, as the property to be burdened, any lands that subsequently became part of the Taylor Ranch. Although, as discussed below, plaintiffs sought at trial to establish that the original settlers and their successors interpreted the Taylor Ranch as the servient estate, it is undisputed that the specific locations referenced in the document are not on defendants' property.

Further, to the extent the rights purportedly granted in the Beaubien document are profits a prendre in gross—that is, personal rights held distinct from any ownership of land—the document did not contain language required under then-existing Colorado law to pass such rights on to the original inhabitants' successors, including plaintiffs.

Under Colorado law prior to 1868, the absence of the words of limitation "and heirs and assigns" in a document conveying an interest in real property meant that the conveyance passed only a life estate. *See In re Newby's Estate,* 146 Colo. 296, 361 P.2d 622 (1961). Although the Beaubien document refers to community members and inhabitants, it does not state that any property rights conveyed to these individuals were to pass to their heirs and assigns; thus, the document could at most have conveyed a life estate in profits a prendre in gross.

Plaintiffs point out that the common-law rule requiring words of inheritance was abolished in Colorado by statute in 1868. However, the repealing statute, 1868 Colo. Terr. L. ch. XC, p. 693, contained a saving clause providing that "as to all rights and titles accrued ... while the same remained in force, all such acts and parts of acts, heretofore repealed, shall be construed to be and remain in force, notwithstanding any such repeal."

2. *The trial court did not err in excluding extrinsic evidence regarding the Beaubien document.*

■ Plaintiffs contend that the trial court erroneously refused to hear their extrinsic

evidence before deciding whether the Beaubien document was ambiguous. They assert that their evidence would have established Beaubien's intent and would have proven, among other things, that the Taylor Ranch property was the servient estate contemplated in the document.

In support of their argument that the court was required to consider extrinsic evidence before deciding whether the Beaubien document was ambiguous, plaintiffs rely primarily on *Lazy Dog Ranch v. Telluray Ranch Corp.*, 965 P.2d 1229 (Colo.1998). We conclude that the trial court's rulings concerning plaintiffs' extrinsic evidence were not improper under *Lazy Dog Ranch.*

In *Lazy Dog Ranch*, the supreme court addressed the use of extrinsic evidence to ascertain the intended use of an easement that had been expressly granted in a warranty deed. Apart from the fact that profits a prendre are not necessarily treated in the same way as easements, we do not read *Lazy Dog Ranch* as mandating consideration of extrinsic evidence where the document at issue is unambiguously insufficient on its face, under then-existing law, to convey the claimed rights. The supreme court cautioned that the instrument conveying an interest in land is to be the primary source of information, and that in cases where the document of conveyance itself specifically addresses the issue, "there will be no need to look at the surrounding circumstances." *Lazy Dog Ranch v. Telluray Ranch Corp.*, *supra*, 965 P.2d at 1236.

Moreover, even though the trial court found the Beaubien document "patently unambiguous," it did in fact allow extensive extrinsic evidence, including expert testimony, bearing on the issue which plaintiffs characterize as central to this claim—namely, the location of the intended servient estate in the Beaubien document. The trial court stated:

The court ... finds that the document itself is patently unambiguous. It's very clear as to what it means. But, as far as any latent ambiguity is concerned, I don't know, and I won't know until after I hear from the witness, as to the application of the document to the geography of the—of

the land, is a subject that I will admit—to which I will admit parol evidence.

In accordance with the court's ruling, plaintiffs' expert testified to the bases for her opinion that the land that presently comprises the Taylor Ranch had to be the land on which the settlement rights were to be exercised.

Thus, to the extent extrinsic evidence was relevant to whether the Taylor Ranch property was the intended servient estate in the Beaubien document, the court in fact permitted plaintiffs to put on such evidence. Upon review of the testimony of plaintiffs' expert as well as the additional expert opinions and materials proffered by plaintiffs that are in the record on appeal, we agree with the trial court that this evidence did not establish that the Beaubien document conveyed the rights claimed by plaintiffs.

3. *Plaintiffs did not establish that the Beaubien document created any rights by implication.*

■ Plaintiffs contend that, even if the Beaubien document did not satisfy the formal requirements for a conveyance of the rights they claim, the trial court should have found such rights by implication. They argue, for example, that the rights which Beaubien intended to convey may be inferred from evidence of the use to which the subject property was put by the inhabitants of the area for nearly 100 years, and that their claimed rights may be deemed to have arisen by implication as part of Beaubien's overall plan for development of the area. We do not agree.

In support of this argument, plaintiffs rely on *Proper v. Greager*, 827 P.2d 591 (Colo. App.1992), and other authorities that have recognized implied easements based on preexisting use. However, as discussed in further detail in Section III below, the claimed rights in this case are not subject for all purposes to the rules applicable in easement cases.

■ Although profits a prendre have some of the characteristics of easements and are often governed by the same rules, the two

interests are not the same. Tiffany explains the difference as follows:

> A profit a prendre, when attached to another estate, is in the nature of an easement, but not technically such. [A]n easement is a privilege without a profit. It involves primarily the doing of a certain act on or to the detriment of another's land, or the right of having another refrain from doing a certain act on or in connection with his own land.... One of the distinguishing features of the pure easement is the absence of all right to participate in the profits of the soil charged with it; the existence of a privilege without profit. The distinguishing feature of the profit a prendre is the right to appropriate and take from the land charged with it a part of the soil or product of it in which there is supposable value.... Each implies such estate in the land as may be necessary to the enjoyment of the right. Each is incorporeal real property.

3 Tiffany Real Property, supra, § 840, at 429.

In *Alexander Dawson, Inc. v. Fling, supra,* the Colorado supreme court held that a deed granting easement rights to boat and swim on a lake did not grant the right to fish. The court explained:

> Profits a prendre involve a greater interest than easements.... [Rights to boat and swim] ... were merely easement rights; and a construction of the deed which would grant [defendants] the right to fish ... would invest them with a greater right, a profit a prendre, a right to which they were not entitled. *A right to profits a prendre must be expressly granted; the burden of an easement may not be increased by investing the holder of such easement with a profit a prendre either by implication or otherwise.*

*Alexander Dawson, Inc. v. Fling, supra,* 155 Colo. at 603–04, 396 P.2d at 601 (emphasis added). In light of *Fling,* the trial court properly rejected plaintiffs' arguments that it should find profits a prendre by implication.

In sum, the Beaubien document was insufficient on its face to convey the rights claimed by plaintiffs on defendants' property. The trial court did not improperly reject extrinsic evidence bearing on the issue. Moreover, because of the nature of those rights, the trial court did not err in declining to find that the document created rights by implication.

### III. *Rights Based on Prescription*

Plaintiffs contend, in the alternative, that they have prescriptive rights to use defendants' property and that the trial court's conclusion to the contrary was error. Again, we disagree.

### A. *Trial Court Proceedings*

In July 1997, plaintiffs sought leave to file a third amended complaint which, for the first time, included a separate claim for relief asserting rights to the subject property on a theory of easements by prescription. Noting that plaintiffs' motion was filed less than two months before trial, the court denied leave to amend, stating:

> The plaintiffs had 16 years to perform discovery and define the issues to be tried. To make drastic changes in the complaint by adding six new claims for relief at the 11th hour would necessitate a delay in the trial of this acrimonious, 17–year–old dispute and that would not best [sic] the interest of justice.

At the beginning of the merits trial, plaintiffs again asserted that, by virtue of the continuous exercise of the rights by themselves and their predecessors in title, they had enforceable rights to defendants' property under the law of prescription. The court allowed them to put on evidence in support of this alternative theory. In accordance with that ruling, individual plaintiffs testified at trial regarding use of defendants' property by their predecessors and themselves for grazing and other purposes.

In its written order following the trial, the trial court reiterated its earlier determination that plaintiffs would not be permitted to present an alternative theory of use by prescription because such theory was offered without adequate notice to defendants.

The court further concluded that, even if it were to consider the evidence and amend the

pleadings to conform to the evidence, plaintiffs' theory of prescription would still fail. First, the rights asserted by the plaintiffs were profits a prendre, which had to be expressly granted and could not be acquired by prescription. Second, even if the claimed rights were subject to creation by prescription, plaintiffs had failed to bear their burden of proof as to adversity, an essential element of a prescription claim.

### B. *Analysis*

On appeal, plaintiffs challenge both the trial court's refusal to permit them to assert their prescription claim and the court's alternative ruling that, even if it were to consider the claim, plaintiffs had not established any use rights to the subject property under a theory of prescription. Because we agree with the trial court's conclusion as to the merits of plaintiffs' prescription claim, we need not decide whether denial of the motion to file a third amended complaint asserting that claim was an abuse of discretion.

Plaintiffs contend that the trial court erred by relying on *Alexander Dawson, Inc. v. Fling, supra,* for the proposition that profits a prendre may not be established by prescription. They argue that *Fling* and the other cases on which the trial court relied apply, at most, to profits a prendre in gross and do not preclude acquisition by prescription of the rights they claim, which they characterize as profits appurtenant to their ownership of properties deeded by Beaubien to the settlers of the Sangre de Cristo grant.

▆▆ Profits a prendre in gross cannot be acquired by prescription. *Deseret Livestock Co. v. Sharp,* 123 Utah 353, 259 P.2d 607 (1963). Nor can the public in general acquire a right to profits a prendre by prescription. *See* 3 *Tiffany Real Property, supra,* § 842, at 433 ("there can be no prescriptive right of profit in the public"); § 936, at 624 ("a right to take profits from land, as distinct from the mere right to use the land, cannot be established by custom, since the effect of such a custom would be to exhaust the profits"). The Tenth Circuit relied on this principle when it observed, in the appeal in Taylor's Torrens action, that it was "settled that the public cannot acquire by custom

or common prescription profits a prendre in another's land." *Sanchez v. Taylor, supra,* 377 F.2d at 738.

▆▆ Thus, we agree with the trial court that, to the extent the rights claimed by plaintiffs are deemed profits a prendre in gross or are "public rights," they cannot be acquired by prescription.

▆▆ Moreover, even if plaintiffs' claimed rights are properly characterized as profits appurtenant, and even if, notwithstanding the broad language in *Alexander Dawson, Inc. v. Fling, supra,* profits appurtenant can be acquired by prescription in the same way as prescriptive easements, we conclude that the trial court did not err in ruling that plaintiffs failed to establish their prescriptive claims.

▆▆ A judgment of a trial court as to the existence of a prescriptive easement will not be disturbed on review if it is based on competent evidence in the record. *Durbin v. Bonanza Corp.,* 716 P.2d 1124 (Colo.App. 1986).

Relying on the standards applicable to prescriptive easements, plaintiffs assert that they could establish their claims by proving continuous, open, and adverse use of the claimed rights for the statutory period of eighteen years. *See Rivera v. Queree,* 145 Colo. 146, 358 P.2d 40 (1960); *Proper v. Greager, supra.* They further contend that, under *Trueblood v. Pierce,* 116 Colo. 221, 179 P.2d 671 (1947), and related authorities, a showing that they or their predecessors had used defendants' property for more than eighteen years raised a presumption that such possession was adverse, and that the trial court erred in declining to apply the presumption of adversity in this case. We agree with the trial court that application of that presumption was unwarranted in the circumstances presented here.

▆▆ Use of unfenced land for grazing and the like, even for the statutory period, is insufficient to raise a presumption of adversity. *See Smith v. Town of Fowler,* 138 Colo. 359, 367, 333 P.2d 1034, 1038 (1959) ("the pasturage of cattle on unfenced land cannot be regarded as hostile and adverse to the owner of such land"); *Simon v. Pettit,* 651

P.2d 418 (Colo.App.1982) (since land in question was vacant, unenclosed, and unoccupied, presumption of adversity was inapplicable in action for declaratory judgment that footpaths crossing defendants' land had become public highways by prescription), *aff'd,* 687 P.2d 1299 (Colo.1984); *see also Palmer Ranch, Ltd. v. Suwansawasdi,* 920 P.2d 870, 873 (Colo.App.1996) ("when the boundaries of land claimed by adverse possession are not established by fences, an adverse claimant may not claim any property not actually occupied for the statutory period").

Plaintiffs argue that these cases are inapplicable because the Taylor Ranch, although unfenced, was supervised by ranch managers before 1960, and was thus not "unoccupied." They further assert that their "grazing practices were so substantial as to put Jack Taylor on notice of a duty to name and serve [them] in the Torrens action." We conclude that neither of these facts is sufficient to warrant application of a presumption of adversity in this case. Here, plaintiffs and their predecessors were using, not a driveway over an individual's property, as in *Trueblood,* but undefined portions of some 80,000 acres of unfenced mountain land.

Because the presumption of adversity did not apply, the burden was on plaintiffs to establish that element of their claim. *See Palmer Ranch Ltd. v. Suwansawasdi, supra.* The record supports the trial court's conclusion that they did not do so. Although there was testimony at trial regarding use of the property for grazing and other purposes, there was also evidence presented that activities on the property prior to 1960 were pursuant to leases, permission of the landowners, or other arrangements. Thus, because there is evidence in the record to support the trial court's determination that plaintiffs did not establish adversity, that determination will not be disturbed on appeal. *See Durbin v. Bonanza Corp., supra.*

### IV. *The Cost Award*

. Although our conclusion that plaintiffs did not establish their claims to use rights on defendants' property makes it unnecessary to address the merits of the due process and class certification issues, we must still consider plaintiffs' challenge to the trial court's cost award.

We note initially that, although defendants sought an award of mandatory costs pursuant to §§ 13–16–105, 13–16–107, and 13–16–122, C.R.S.1999, following the due process trial in 1997, and again moved for costs after the merits trial, the court order awarding costs does not set forth the basis for the award. On appeal, both sides appear to view the award as having been made pursuant to C.R.C.P. 54(d), which states that, except when express provision therefor is made in a statute or rule, costs "shall be allowed as of course to the prevailing party unless the court otherwise directs."

### A.

■ Plaintiffs first contend that costs should not have been awarded to defendants in connection with the due process trial because defendants were not the prevailing party. We are unpersuaded.

■■ A prevailing party is one who has succeeded upon a significant issue presented by the litigation and has achieved some of the benefits sought in the lawsuit. *National Canada Corp. v. Dikeou,* 868 P.2d 1131 (Colo. App.1993). If each party prevails in part, an award of costs is committed to the sole discretion of the trial court. *Husband v. Colorado Mountain Cellars, Inc.,* 867 P.2d 57 (Colo.App.1993).

Here, of the plaintiffs whose claims were litigated in the due process trial, only a few individuals established that their due process rights had been violated in the original Torrens action and thus escaped dismissal of their claims at that stage in the proceedings. In these circumstances, it was not an abuse of discretion for the trial court to conclude that defendants were the prevailing party in the due process trial, and to assess costs against the plaintiffs who were dismissed.

### B.

■ Nor do we agree with plaintiffs' contention that certain costs related to defendants' expert should not have been assessed because the expert testified to legal issues

that were not properly the subject of expert testimony.

The expert to whom plaintiffs refer testified regarding the steps a reasonably prudent applicant in a Torrens action would take to ascertain the names of persons who claimed an interest in the property. It was not an abuse of discretion for the trial court to permit expert testimony on this issue and to rely on that testimony in reaching its conclusions on the due process issues. *See* CRE 702; *People v. Fasy*, 829 P.2d 1314 (Colo.1992). Thus, the witness fees incurred in connection with that expert were properly included in the cost award. *See* § 13–16–122(1)(g), C.R.S.1999.

### C.

■ We are similarly unpersuaded by plaintiffs' contention that the trial court abused its discretion in rejecting their proposal for a pro rata apportionment of costs and, instead, assessing costs against all the dismissed plaintiffs jointly and severally.

■ Whether to allocate costs on a pro rata basis is discretionary with the trial court. *See Winkler v. Rocky Mountain Conference of the United Methodist Church*, 923 P.2d 152 (Colo.App.1995). In *Winkler* and in *Bohrer v. DeHart*, 943 P.2d 1220 (Colo.App. 1996), divisions of this court rejected arguments that it was an abuse of discretion to award costs jointly and severally rather than apportioning the costs. Similarly here, we conclude that it was within the trial court's discretion to decline plaintiffs' request for a pro rata apportionment of costs.

### ISSUES ON CROSS–APPEAL

In light of our resolution of the issues on appeal, we address only those issues on cross-appeal relating to defendants' claim for attorney fees.

■ Defendants assert that plaintiffs' claims are frivolous and groundless within the meaning of *Western United Realty, Inc. v. Isaacs*, 679 P.2d 1063 (Colo.1984), and that the trial court therefore erred in denying their request for attorney fees pursuant to § 13–17–102, C.R.S.1999. They further contend that, under the version of § 13–17–102 in effect at the time this action was filed, they were entitled to a hearing and findings on their claim for fees. Finally, they assert that they are entitled to their attorney fees on appeal. We disagree with each contention.

■ Whether to award attorney fees under § 13–17–102 is a matter committed to the discretion of the trial court. The trial court's decision will be upheld on appeal if it is supported by the evidence. *M Life Insurance Co. v. Sapers & Wallack Insurance Agency, Inc.*, 962 P.2d 335 (Colo.App.1998).

■ A claim is frivolous if the proponent can present no rational argument based on the evidence or law in support of that claim or defense. Similarly, a claim is groundless if the allegations in the complaint, while sufficient to survive a motion to dismiss for failure to state a claim, are not supported by any credible evidence at trial. *Western United Realty, Inc. v. Isaacs, supra.*

Like the courts that have rejected defendants' attorney fee claims at prior stages in these proceedings, *see Rael v. Taylor, supra*, we conclude that plaintiffs' claims, although ultimately unsuccessful, were neither groundless nor frivolous. Plaintiffs offered both rational argument, based on legal authority, and credible evidence in support of their claims, and in fact prevailed on some issues during the long history of this case. The fact that we have determined that plaintiffs are not entitled to relief does not make their claims frivolous.

We thus conclude that it was not an abuse of the trial court's discretion to deny defendants' request for attorney fees. Further, because the record before us adequately establishes that plaintiffs' claims were neither frivolous nor groundless, any error on the part of the trial court in declining to hold a hearing or make findings in support of its denial is harmless.

■ We similarly conclude that the appeal is not frivolous, and therefore deny defendants' request for their appellate attorney fees pursuant to C.A.R. 38(d). *See Wood*

*Bros. Homes, Inc. v. Howard,* 862 P.2d 925 (Colo.1993).

The judgment is affirmed.

Judge MARQUEZ and Judge ROY concur.