The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader.  The summaries may not be cited or relied upon as they are not the official language of the division.  Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
November 15, 2018

## 2018COA160

## No. 16CA2083, *Alire v. Cielo Vista Ranch* — Real Property — Easements Appurtenant; Public Lands — Mexican Land Grants

Fifteen years after the supreme court remanded this case to the district court with instructions to "identify all landowners who have access rights to the Taylor Ranch," a division of the court of appeals reviews whether the district court's proceedings on remand discharged the mandate.

The supreme court's decisions in *Lobato v. Taylor*, 71 P.3d 938 (Colo. 2002), and *Lobato v. Taylor*, 70 P.3d 1152 (Colo. 2003), constitute the mandate in this case.  In the *Lobato* decisions, the supreme court held that present-day San Luis Valley landowners have the right to access the Taylor Ranch — now the Cielo Vista Ranch — upon showing their land was settled by 1869.  Around that time, Charles Beaubien persuaded frontier families from New

Mexico to settle in the valley by granting these settlers the right to graze their animals and gather wood and timber from the forested, mountainous areas nearby. Today, these areas comprise the Cielo Vista Ranch.

In 2004, the district court began identifying and decreeing access rights for landowners in the San Luis Valley whose land was settled by 1869. From 2004 until 2010, the district court relied on the best available evidence to decree access rights for individual landowners without requiring any landowner to come forward to assert a claim. In 2010, this changed. After 2010, the district court decreed access rights for only those landowners who came forward to assert claims.

In this opinion, the division concludes that the proceedings on remand were largely consistent with the mandate, but that the district court did not completely discharge its mandate because the identification process used after 2010 could have been, but was not, comprehensive. The division concludes that the undisputed evidence would enable the district court to "identify all landowners who have access rights," and, therefore, remands for the district court to completely discharge its mandate by identifying all current

owners of lands which the undisputed evidence shows were settled

as of 1869.

COLORADO COURT OF APPEALS                                                  **2018COA160**

Court of Appeals No. 16CA2083
Costilla County District Court Nos. 81CV5 & 81CV100005
Honorable Gaspar F. Perricone, Judge
Honorable Kenneth A. Plotz, Judge

Cielo Vista Ranch I, LLC; Jaroso Creek Ranch, LLC; and Western Properties Investors, LLC,

Defendants-Appellants and Cross-Appellees,

v.

Billy Alire, Willie Alire, Leonides Atencio, Robert Atencio, Frances D. Berggran-Buhrles, Zach Bernal, Jose Fred Carson, Emilio DeHerrera, Juan DeHerrera, Adeline Espinosa, Edward Espinosa, Elmer Manuel Espinoza, Margurito Espinoza, Pete E. Espinoza, Corpus Gallegos, Gloria Gallegos, Jose A. Gallegos, Moises Gallegos, Ruben Gallegos, Rupert Gallegos, Raymond Garcia, Richard J. Garcia, Robert Garcia, Manuel Gardunio, Ruben Herrara, Gilbert G. Herrera, Charlie Jacquez, Jr., J.R. Jaquez, Jeffrey Jaquez, Maria Jaquez, Adelmo Kaber, Juan Lacombe, Adolph J. Lobato, Bonifacio "Bonnie" Lobato, Carlos Lobato, Emilio Lobato, Jr., Eugene Lobato, Henry Lobato, Jose F. Lobato, Pete Lobato, Presesentacion Lobato, Crucito Maes, Bert Maestas, Manuel Maestas, Norman Maestas, Raymond J. Maestas, Robert "Bobby" Maestas, Clorindo Martinez, David Martinez, Eugene Martinez, Hubert J. Martinez, Jesse Martinez, Jesse Martinez, Leonardo Martinez, Rosendo Martinez, Solestiano Martinez, Agatha Medina, Alfonso Medina, Cory Medina, Gilbert Medina, Leonardo Medina, Loyola Medina, Marvin Medina, Orry Medina, Raymond M. Medina, Gilbert "Andres" Montoya, Rudy Montoya, Willie Ray Montoya, Frank Olivas, Gurtrude C. Olivas, Shirley Romero Otero, Eppy Quintana, Apolinar Rael, Henry Rodriguez, Robert Romero, Bentura Roybal, Lucille Samelko, Anthony Sanchez, Bonnie Sanchez, Eugene Sanchez, Evan Sanchez, Frank Sanchez, Gerald Sanchez, James Sanchez, Jose G. Sanchez, Rufino Sanchez, S.R. Sanchez, Vernon Sanchez, Ronald A. Sandoval, Elesam Santistevan, Daniel Segura, Floyd R. Solan, Carolyn Taylor, Jose R. Torres, Arnold Valdez, Sam Valdez, Emejido Vialpando, Lawrence Vialpando, Martha Vialpando, Ervin L. Vigil, Joe P. Vigil, Larry J. Vigil, Manuel Vigil, Michael J. Vigil, Walter Vigil, David Cordova, Jerome Cordova, Matthew Cordova, Rodney Cordova, S. Raymond Cordova, Theresa Cordova, Isidro Gomez, Rosalie Gallegos, Mark Martinez, Daniel Martinez, Mike Martinez, Joseph Medina, Manuel Pacheco, Silas Pacheco, Julian Padilla, and Mary Renden,

Plaintiffs-Appellees and Cross-Appellants.

---

JUDGMENT AFFIRMED IN PART, REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division III
Opinion by JUDGE WELLING
Webb and Harris, JJ., concur

Announced November 15, 2018

---

Squire Patton Boggs, LLP, Carolyn L. McIntosh, Aaron A. Boschee, Brent R. Owen, Denver, Colorado, for Plaintiffs-Appellees and Cross-Appellants Billy Alire, Willie Alire, Leonides Atencio, Robert Atencio, Frances D. Berggran-Buhrles, Zach Bernal, Jose Fred Carson, Emilio DeHerrera, Juan DeHerrera, Adeline Espinosa, Edward Espinosa, Elmer Manuel Espinoza, Margurito Espinoza, Pete E. Espinoza, Corpus Gallegos, Gloria Gallegos, Jose A. Gallegos, Moises Gallegos, Ruben Gallegos, Rupert Gallegos, Raymond Garcia, Richard J. Garcia, Robert Garcia, Manuel Gardunio, Ruben Herrara, Gilbert G. Herrera, Charlie Jacquez, Jr., J.R. Jaquez, Jeffrey Jaquez, Maria Jaquez, Adelmo Kaber, Juan Lacombe, Adolph J. Lobato, Bonifacio "Bonnie" Lobato, Carlos Lobato, Emilio Lobato, Jr., Eugene Lobato, Henry Lobato, Jose F. Lobato, Pete Lobato, Presesentacion Lobato, Crucito Maes, Bert Maestas, Manuel Maestas, Norman Maestas, Raymond J. Maestas, Robert "Bobby" Maestas, Clorindo Martinez, David Martinez, Eugene Martinez, Hubert J. Martinez, Jesse Martinez, Jesse Martinez, Leonardo Martinez, Rosendo Martinez, Solestiano Martinez, Agatha Medina, Alfonso Medina, Cory Medina, Gilbert Medina, Leonardo Medina, Loyola Medina, Marvin Medina, Orry Medina, Raymond M. Medina, Gilbert "Andres" Montoya, Rudy Montoya, Willie Ray Montoya, Frank Olivas, Gurtrude C. Olivas, Shirley Romero Otero, Eppy Quintana, Apolinar Rael, Henry Rodriguez, Robert Romero, Bentura Roybal, Lucille Samelko, Anthony Sanchez, Bonnie Sanchez, Eugene Sanchez, Evan Sanchez, Frank Sanchez, Gerald Sanchez, James Sanchez, Jose G. Sanchez, Rufino Sanchez, S.R. Sanchez, Vernon Sanchez, Ronald A. Sandoval, Elesam Santistevan, Daniel Segura, Floyd R. Solan, Carolyn Taylor, Jose R. Torres, Arnold Valdez, Sam Valdez, Emejido Vialpando, Lawrence Vialpando, Martha Vialpando, Ervin L. Vigil, Joe P. Vigil, Larry J. Vigil, Manuel Vigil, Michael J. Vigil, and Walter Vigil

Polsinelli, PC, Bennett L. Cohen, Denver, Colorado, for Plaintiffs-Appellees and Cross-Appellants David Cordova, Jerome Cordova, Matthew Cordova, Rodney Cordova, S. Raymond Cordova, Theresa Cordova, Isidro Gomez, Rosalie Gallegos, Mark Martinez, Daniel Martinez, Mike Martinez, Joseph Medina, Manuel Pacheco, Silas Pacheco, Julian Padilla, and Mary Renden

Spencer Fane LLP, Ronald L. Fano, Jamie N. Cotter, Denver, Colorado, for Defendant-Appellant and Cross-Appellee Cielo Vista Ranch I, LLC

Dill, Dill, Carr, Stonbraker & Hutchings, P.C., John J. Coates, Denver, Colorado, for Defendants-Appellants and Cross-Appellees Jaroso Creek Ranch, LLC, and Western Properties Investors, LLC

Butler Snow, LLP, Martina Hinojosa, Denver, Colorado, for Amicus Curiae

¶ 1    The origins of this case predate Colorado's statehood, and along the way the parties have endured a long and circuitous road, which has included three prior visits to this court and three supreme court opinions. This appeal concerns the remand proceedings conducted pursuant to the supreme court's two most recent decisions in this case: *Lobato v. Taylor*, 71 P.3d 938 (Colo. 2002) (*Lobato I*), and *Lobato v. Taylor*, 70 P.3d 1152 (Colo. 2003), *as modified on denial of reh'g* (June 16, 2003) (*Lobato II*). These remand proceedings were initiated fourteen years ago, in 2004, and remained active until this appeal.

¶ 2    Appellants are CVR Properties, Ltd., Jaroso Creek Ranch, LLC, and Western Properties Investors LLC, the owners of Cielo Vista Ranch and other properties that were once known as the Taylor Ranch (the Ranch). (We will refer to appellants collectively as Ranch Owner.) Ranch Owner challenges the trial court's implementation of the supreme court's mandate on remand. Appellees are landowners in Costilla County whose rights to access the Ranch to graze livestock and gather firewood and timber were decreed through the remand proceedings. Landowners have also

1

cross-appealed, challenging certain proceedings on remand as contrary to the mandate.

¶ 3    In *Lobato I* and *Lobato II*, the supreme court held that Costilla County landowners whose land was settled as of 1869 were entitled to access the Ranch for grazing and to take firewood and timber.[1] *See Lobato I*, 71 P.3d at 956; *Lobato II*, 70 P.3d at 1167. Carlos Beaubien had recruited frontier families to settle in the area in the 1850s and induced settlement by granting settlers the right to access and use the Ranch for grazing, firewood, and timber. This grant was memorialized in a Spanish language document — the Beaubien Document — that was executed and recorded by Beaubien in 1863. The supreme court held that Beaubien had granted permanent access rights that run with the land. *Lobato I*, 71 P.3d at 948-50. When it remanded the case after *Lobato II*, the supreme court "direct[ed] the trial court to identify all landowners who have access rights to the [Ranch] and to enter all necessary

_____

[1] This is also referred to as the time of Gilpin because at that time William Gilpin owned the Ranch. In October 2007, the trial court determined that the time of Gilpin ended on January 27, 1869. This determination is not being contested on appeal.

and appropriate orders to safeguard those rights." *Lobato II*, 70 P.3d at 1156.

¶ 4    To the extent the issues on appeal challenge the trial court's implementation of the supreme court's mandate, our role is limited to reviewing the trial court's compliance with the mandate.  We are not free to disregard or modify the supreme court's mandate.  Simply put, we have no more latitude than the trial court to rewrite or second-guess the mandate.  Only the supreme court is free to modify its mandate.  To the extent either party invites us to do so, we must decline.

¶ 5    On appeal, Ranch Owner contends that the proceedings on remand from 2004 through 2010, when the trial court identified most of the landowners with access rights to the Ranch, violated the mandate.  Ranch Owner raises several contentions of error.  Ranch Owner's central contention is that the trial court's "opt-out" process, pursuant to which it decreed access rights for individual Costilla County landowners even if they had not come forward to make a claim, improperly relieved these landowners of their burden of proof.

¶ 6    On cross-appeal, landowners contend that the trial court violated the mandate when, in 2010, it switched to an "opt-in" process to identify any remaining Costilla County landowners with access rights. They contend that this opt-in process, implemented from 2010 through 2016, failed to comprehensively identify all Costilla County landowners with access rights, as required by the mandate.

¶ 7    For the reasons set forth in this opinion, we conclude that the opt-out proceedings on remand from 2004 through 2010 were largely consistent with *Lobato II*'s mandate. But we also conclude that the opt-in process implemented from 2010 through 2016 failed to discharge the mandate because that portion of the identification process also could have been comprehensive, but was not.

¶ 8    During the opt-out proceedings from 2004 through 2010, the trial court identified benefited landowners based on an official 1894 Costilla County land survey, which the supreme court described as "the best [available] evidence of benefited properties conveyed by Beaubien." *Lobato II*, 70 P.3d at 1159 n.6. We refer to the 1894 survey as "Map A and Book E" because of its location in the Costilla County records. Map A demarcates the boundaries and locations of

4

the original vara strip tracts[2] conveyed by Beaubien to settlers, while Book E describes each tract shown on Map A and identifies the settler to whom Beaubien originally conveyed the tract.[3]  Based on footnote six from *Lobato II* and the absence of contrary evidence, the trial court presumed that all Map A and Book E lands were settled as of 1869, which entitled their present-day owners to access the Ranch.

¶ 9     For the duration of the opt-out process, the trial court worked backward from Map A and Book E to identify benefited Costilla County landowners and adjudicate their rights.  It appointed the owner of the San Luis Valley Title Company to identify the present-day owners of the lands shown on Map A.  After these benefited landowners were identified, Ranch Owner could assert res judicata as an affirmative defense to bar the claims of any individual

---

[2] A "vara" refers to a stretch of approximately 33 inches along the bank of a river or creek.  A "vara strip" is an area of land one vara long with its width running to the boundary of the adjacent watershed.
[3] Ultimately, in January 2015, Ranch Owner stipulated that all Map A lands were timely settled.

landowners.[4]  Once the trial court determined that a benefited landowner was not subject to res judicata, it notified that landowner of his or her right to access the Ranch for reasonable grazing of livestock and to gather timber and firewood for household use.  Any landowner whom the trial court found to be barred by res judicata was notified and given an opportunity for a hearing.  Landowners were not otherwise required to come forward in order to assert individual claims as a condition of the trial court adjudicating their rights.  Around 4500 Costilla County landowners gained access rights to the Ranch through the proceedings from 2004 through 2010, which we refer to as the opt-out process.

¶ 10    In 2010, once the trial court had identified and adjudicated the rights of most present-day owners of the lands in Map A and Book E, it implemented a new process under which any remaining

---

[4] Ranch Owner asserted res judicata against certain landowners by presenting evidence that the landowner or the landowner's predecessor in interest was personally served with adequate notice of the 1960 Torrens actions brought in federal court, described in Part I, *infra.*  We use the term "res judicata" throughout this opinion instead of the preferred term "claim preclusion" in order to be consistent with the prior opinions in this case.  *See Lobato II,* 70 P.3d at 1156 n.2 (explaining use of the term res judicata instead of claim preclusion).

landowners with access rights were required to come forward and assert a claim before the trial court would adjudicate their rights. Because this process required landowners to affirmatively come forward to have their rights adjudicated, we refer to the proceedings from 2010 through 2016 as the opt-in process. Approximately 350 more Costilla County landowners gained access rights to the Ranch during this time.

¶ 11 We conclude that the opt-out process implemented from 2004 through 2010 produced an efficient and comprehensive result with respect to the Map A portion of Costilla County. In our view, the opt-out process was consistent with the supreme court's mandate to identify *all* benefited landowners on remand.

¶ 12 In contrast, however, we conclude that the opt-in process implemented from 2010 through 2016 did not fully comport with the mandate because the trial court, pursuant to that process, failed to comprehensively and conclusively adjudicate the access rights of landowners in the remainder of Costilla County, even though it could have done so while remaining faithful to the mandate.

¶ 13　During this second phase of the proceedings on remand, the trial court could have identified *all* remaining Costilla County landowners with access rights by using a combination of the same general opt-out process used from 2004 through 2010, in addition to a modified opt-in process.  Although Map A and Book E had been exhausted as a reference for identifying benefited lands, landowners presented undisputed evidence showing that other lands — lands outside of Map A — were timely settled.  Because the trial court never attempted to identify all present-day owners of these undisputedly timely settled lands, instead adjudicating the rights of only those landowners who came forward to assert claims, we conclude that it failed to discharge its mandate.  We, therefore, reverse the trial court's October 2016 order to the extent it requires any remaining landowners entitled to access the Ranch to come forward, and remand the case to the trial court with instructions to identify all remaining owners of benefited lands in Costilla County and adjudicate their rights.  In all other respects, we affirm the trial court's orders that are challenged on appeal.

## I.    Background

¶ 14    A detailed recitation of the historical events underlying this case was provided by the supreme court in *Lobato I, see* 71 P.3d at 942-45, and *Lobato II, see* 70 P.3d at 1155-57.  We will not repeat it here.  Instead, we limit our background section to the facts necessary to understand the issues presented by this appeal.

¶ 15    The relevant case history begins in 1960, when Jack Taylor purchased the vast majority of the land that now constitutes the Ranch.  Taylor purchased the land with notice of landowners' existing use of the Ranch; his deed provided that he took the land subject to "claims of the local people by prescription or otherwise to right to pasture, wood, and lumber . . . upon said land." Nevertheless, he soon fenced the property and barred landowners' entry.  In 1960, Taylor also filed a Torrens action in federal district court in Denver.[5]  In his Torrens action, Taylor sought to perfect his title and extinguish the landowners' access claims.  But Taylor

---

[5] The Colorado Torrens Title Registration Act allowed land owners to file an action that would essentially quiet title to their land. §§ 118-10-1 to -102, C.R.S. 1960 (now codified at §§ 38-36-101 to -199, C.R.S. 2018).  Because Taylor was a North Carolina resident, he invoked the federal court's diversity jurisdiction.  *See Lobato I,* 71 P.3d at 943, n.1.

personally served only a small fraction of Costilla County landowners with notice of his Torrens action, with the majority of landowners receiving notice only by publication. The district court ruled that landowners had no rights to the Ranch, and the Tenth Circuit Court of Appeals affirmed. *See Sanchez v. Taylor*, 377 F.2d 733 (10th Cir. 1967).

¶ 16    In 1973, Taylor purchased an adjoining, 2500-acre parcel of land known as the Salazar estate. The Salazar estate was also part of the original Sangre de Cristo grant that was once owned by Beaubien. Taylor's predecessor in title to the Salazar estate had also filed a Torrens title action in 1960, which similarly determined that Costilla County landowners had no rights to access the estate. We will refer to Taylor's 1960 Torrens action and the 1960 Salazar Torrens action together as the 1960 Torrens actions.

¶ 17    In 1981, a number of Costilla County landowners filed this action in Colorado state court, asserting that Taylor's actions to bar their entry violated their rights to access the Ranch. The district court held that the doctrine of res judicata barred the suit because the Salazar Torrens action and the *Sanchez* decision were binding upon them. A division of this court affirmed. *Rael v. Taylor,* 832

10

P.2d 1011, 1014 (Colo. App. 1991). The supreme court then granted certiorari and reversed in part and remanded, questioning the constitutional adequacy of the publication notice in the 1960 Torrens actions. *Rael v. Taylor*, 876 P.2d 1210, 1228 (Colo. 1994). The supreme court directed the trial court to determine which landowner plaintiffs had received adequate notice in the 1960 Torrens actions, and to hold a trial on the merits.

¶ 18    The trial court, on remand, dismissed all but ten landowner plaintiffs as barred by res judicata and denied class certification. It then held a trial on the merits and determined that the remaining landowners had not proved prescriptive rights to the Ranch because their use was not adverse. The trial court also denied landowners' claims based on the Beaubien Document and implied rights doctrines. A division of this court affirmed. *Lobato v. Taylor*, 13 P.3d 821 (Colo. App. 2000). Landowners appealed, and the supreme court granted certiorari in *Lobato I*.

### A.    *Lobato I*

¶ 19    In *Lobato I*, the supreme court reversed the court of appeals and held that the original settlers of Beaubien's grant and their successors in title had implied rights of access to the Taylor Ranch

11

for reasonable grazing, firewood, and timber. 71 P.3d at 957. The supreme court excluded hunting, fishing, and recreation from the scope of the landowners' rights. *Id.* It defined the Taylor Ranch as including two parcels of land: the 77,000-acre mountain tract and the 2500-acre Salazar estate. *Id.* at 943-44.

¶ 20 After deciding *Lobato I*, the supreme court retained jurisdiction and directed the parties to brief due process and res judicata issues left unresolved by the supreme court's *Lobato I* opinion. *Id.*

### B. *Lobato II*

¶ 21 The supreme court decided the remaining issues in *Lobato II*, where it held that landowners who were successors to the original settlers of the land grant had reasonable access rights to the Taylor Ranch. 70 P.3d at 1167. The supreme court also held that Taylor had not satisfied due process when he served landowners with notice by publication in his 1960 Torrens action, but that res judicata barred claims by landowners and their successors who were "personally named and served" in the Torrens action. *Id.* at 1166-67.

¶ 22 With those remaining issues resolved, the supreme court remanded the case for the trial court to "identify all landowners who

have access rights to the Taylor Ranch and to enter all necessary and appropriate orders to safeguard these rights." *Id.* at 1167-68.

## C.     Remand Process Following *Lobato II*

¶ 23     Early in the remand proceedings, the trial court articulated its understanding of the supreme court's mandate. It explained that, pursuant to *Lobato II*, it was "responsible for identifying the current landowners who have access rights to the former Taylor Ranch." The trial court described this process as an "administrative task" that should be completed "as quickly as possible." It acknowledged that "other contested issues" would arise during the identification process but advised the parties that any such issues "should be litigated after the major portion of the identification process is completed."

¶ 24     Before the identification process began, the trial court granted access rights to the nine landowners who the supreme court held had proved their claims by tracing their titles to the time of Gilpin.[6] *See Lobato II*, 70 P.3d at 1159 n.5. The trial court ordered that these landowners were not restricted as to whom they were allowed

---

[6] The nine landowners include the seven plaintiffs in *Lobato II* as well as two landowner intervenors.

to bring onto the Ranch to assist in the exercise of their rights, but it advised Ranch Owner that it "may subsequently present matters to the Court" if landowners "are abusing the land or their rights."

¶ 25    In January 2004, before the trial court had decided how to proceed, Ranch Owner proposed a plan to personally serve all Costilla County landowners with notice of the proceedings and require them to come forward and make a claim to access the Ranch or be forever barred from asserting an access claim. The trial court rejected Ranch Owner's proposal, observing that "[t]here are presently over 31,000 individual landowners" in Costilla County and that joinder of each individual landowner to the action would be "totally impractical." Additionally, the trial court expressed concern that personal service on all Costilla County landowners would not be sufficient to ensure the participation of all benefited landowners because many landowners would likely misapprehend the notices and believe that their rights had been adjudicated.

¶ 26    Rather than require each individual landowner to come forward to make a claim, the trial court decided to adjudicate landowners' rights by relying on the best available evidence of timely settlement — namely, Map A and Book E. The trial court

then certified a class comprised of "all Costilla County landowners with use rights claims."[7] Finding that "this case represents a unique situation in which the conventional requirements of a class action have been determined" by the supreme court and that joinder of all 31,000 landowners in Costilla County would be impractical, the trial court ruled that class certification was both necessary and authorized under C.R.C.P. 23.

¶ 27    Next, the trial court laid out a two-phase process to identify and adjudicate the rights of benefited landowners.

¶ 28    First, the trial court would identify all present-day owners of the lands shown on Map A. For that purpose, the trial court appointed David Duncan, the owner of San Luis Valley Title Company, as "an abstractor to advise the Court by written report of those present-day landowners in Costilla County who are successors in title to the original settlers of the Beaubien grant."[8] This was the opt-out process.

---

[7] The trial court designated as class representatives the seven landowner plaintiffs and two intervenors who the supreme court held were entitled to access the Ranch.
[8] With respect to its decision to appoint Mr. Duncan in this capacity, the trial court observed that "the San Luis Valley Title

¶ 29    Second, once the identification process based on Map A and Book E was completed "to the Court's satisfaction," the trial court advised that it would "adopt other procedures to notify, locate, and adjudicate the rights of other present landowners who claim access" to the Ranch.  This became the opt-in process.

¶ 30    Both the opt-out and opt-in processes included a res judicata component.  Where Ranch Owner presented evidence sufficient to show that any individual landowner or a predecessor in interest was personally served in Taylor's 1960 Torrens action or the 1960 Salazar Torrens action, the trial court barred his or her access claim pursuant to res judicata.  Depending on whether the evidence showed that the landowner was personally served in Taylor's 1960 Torrens action, the 1960 Salazar Torrens action, or both, the trial court barred that landowner's claim to the mountain tract, the Salazar estate portion of the Ranch, or both.

---

Company has the plat of real estate records and transactions in Costilla County that is superior to that in the office of the county clerk and recorder."

16

### 1. The Opt-Out Process: 2004-2010

¶ 31 The title company submitted its initial report to the trial court in September 2004 (the 2004 Duncan Report). The report identified sixteen separate tracts of land from Map A. For each tract, the report cited to the page number within Book E where the tract was located and identified to whom Charles Beaubien made the original conveyance, the 1960 owner,[9] and the present-day owner.

¶ 32 In March 2005, the trial court decreed access rights for the owners of the tracts identified in the 2004 Duncan Report. In the order granting access rights, the trial court found that the information contained in the 2004 Duncan Report, considered along with the statements of the title company owner describing "the use of Map A and Book E together with the book and page number of each transaction," established by a preponderance of the evidence that "the information contained therein is true." The trial

---

[9] The trial court directed the title company to identify the 1960 owner of each tract to enable Ranch Owner to assert res judicata as a defense by presenting evidence to show that the 1960 owner was personally named and served in connection with the 1960 Torrens actions.

court also found that "no objection has been raised to the accuracy of or the factual information in the" 2004 Duncan Report.

¶ 33 The trial court then found that "all tracts identified in the Duncan Report of September 30, 2004 were timely settled," explaining that "[t]he report identifies each tract examined as one deeded by Carlos Beaubien to a first settler during Beaubien's lifetime and that such determination is sufficient to establish the issue of timely settlement. The [Ranch Owner] Defendants have presented no competent evidence to the contrary." Later in the remand proceedings, Ranch Owner stipulated to the timely settlement of all Map A lands.

¶ 34 In addition to finding that these tracts were timely settled, the trial court found that the 2004 Duncan Report "establishes the conclusive identity of the current owners," and that Ranch Owner "presented no competent evidence to the contrary." The trial court concluded, therefore, that the landowners identified in the 2004 Duncan Report had access rights to the Ranch, subject to the res judicata bar.

¶ 35 It then turned to the res judicata bar. The trial court found that, because "[r]es judicata in this case is a limitation upon a

person otherwise entitled to the right of access," the bar "must be total and complete to be effective."[10]  For example, the trial court explained, "a successor in title is not barred by the doctrine of Res Judicata who receives title through the barred co-owner and a co-owner who is not barred."  The trial court also considered Ranch Owner's offer of proof, which included evidence of the returns of service in the 1960 Torrens actions.

¶ 36    The trial court then determined, on a tract-by-tract basis, whether any of the tracts listed in the 2004 Duncan Report were subject to the res judicata bar.  After making findings about each tract, the trial court concluded that all such tracts that were not subject to the bar were entitled to access the Ranch "to graze animals, gather firewood, and remove timber."

---

[10] Additionally, the trial court found that the Colorado Rules of Civil Procedure in effect when the Torrens actions were filed in 1960 required that, to be effective, personal service must be made either to the named individual personally or to an adult family member at the individual's residence.  *See* C.R.C.P. 4(e)(1) (1960); *see also* § 118-10-21, C.R.S. 1960 (requiring that service in a Torrens action must comply with the Colorado Rules of Civil Procedure).  It also found that the summons must be served with the application for personal service to be adequate.  *See* § 118-10-15, C.R.S. 1960.

¶ 37    From 2005 to 2010, the title company periodically issued new

reports identifying separate Map A tracts and the present and 1960

owners of each tract.  In 2006, the title company's reports revealed

that certain portions of the Ranch were comprised of original vara

strip lands that were once benefited by Beaubien's grant.

¶ 38    The trial court decreed access rights for the landowners

identified in the Duncan Reports whose claims were not barred by

res judicata.  When the court determined that a landowner was

barred by res judicata, that landowner was notified and offered a

hearing.  Through this initial phase of the identification process, the

trial court identified all present-day owners of land within Map A.

Altogether, this process resulted in access rights being decreed for

4500 landowners and 6000 parcels.[11]

---

[11] During the opt-out process, the trial court also presumed timely
settlement and decreed access rights for landowners in the towns of
San Luis, San Pablo, and Los Vallejo, on the grounds that each
town was mentioned in Beaubien's granting document.  The trial
court adjudicated access rights for these landowners through the
same process used for Map A and Book E landowners.

¶ 39     The opt-out process reached substantial completion by 2010.[12] With the opt-out process nearing completion and upon finding no just reason to further delay entry of a final judgment, the trial court certified its orders on remand as final under C.R.C.P. 54(b).  Ranch Owner appealed the judgment.  Landowners cross-appealed.  But a division of this court dismissed the appeal without prejudice as premature, concluding that the trial court had not, in fact, entered a final appealable judgment.  *See Lobato v. CVR Props., Ltd.*, (Colo. App. No. 09CA1822, Feb. 4, 2010) (unpublished order).

### 2.     The Opt-In Process: 2010-2016

¶ 40     In 2010, having exhausted the identification based on Map A and Book E, the trial court initiated a new identification process, the opt-in process.[13]

¶ 41     The trial court initiated the opt-in process by sending notices by mail to all landowners in the southern portion of Costilla

---

[12] Because the pace of the title company's work slowed toward the end of the process due to the ailing health of the principals, it did not issue its final report until May 2012.

[13] In February 2010, the presiding trial court judge, Judge Gaspar Perricone, retired and was replaced by Judge Kenneth Plotz.

County[14] advising them of their right to participate in the opt-in identification process. Ranch Owner did not renew its proposal to personally serve all Costilla County landowners.[15] Each notice advised that the landowner must respond within 120 days to participate in the opt-in process, but stated that "[l]andowners will not lose their opportunity to establish access rights if they choose not to participate in the identification process." Altogether, approximately 23,000 advisory notices were mailed; roughly 1200 landowners came forward to make claims, and the trial court granted access rights to around 350 additional parcels.

¶ 42     In January 2015, landowners and Ranch Owner entered into a joint stipulation "to delineate certain geographic areas within Costilla County that were settled by January 1869." The parties stipulated that "landowners in Costilla County who are able to trace

---

[14] In the time of Gilpin, the Sangre de Cristo land grant was divided into two parcels: a southern portion (Costilla Estate) and a northern portion (Trinchera Estate). Finding no evidence that Gilpin transferred any lands in the northern portion to settlers, the trial court concluded that notice need only be mailed to landowners in the southern half of Costilla County. The parties thereafter stipulated to a line dividing the northern and southern halves of Costilla County.

[15] Nor did Ranch Owner request to personally serve all landowners whose access rights had not been adjudicated one way or the other.

the settlement of their property to the Time of Gilpin, defined as January 1869 . . . are entitled to all appurtenant easement rights delineated by the Court in *Lobato II*." The parties further stipulated that all lands delineated in the map attached to the stipulation — areas termed the "Stipulated Settled Lands" — were settled no later than January 1869. The Stipulated Settled Lands encompassed all of the Map A and Book E land, plus the towns that were named in the Beaubien Document and lands that were within the other settlements to which Ranch Owner previously stipulated. The stipulation provided that "landowners may obtain Easement Rights for their property by showing, through the best available evidence, that their property is situated within the Stipulated Settled Lands."

¶ 43    In 2016, after the trial court adjudicated the claims of those landowners who responded to the 2010 advisory notices, Ranch Owner moved to serve any unidentified or nonresponding claimants with notice through publication. The trial court denied Ranch Owner's motion, concluding that service by publication would violate the supreme court's mandate by extinguishing the rights of any landowners who did not then come forward, without any attempt to personally serve them. The trial court concluded that

"pragmatic finality" was achievable for purposes of Rule 54(b) without service by publication and certified its orders as final for appeal. The trial court reiterated that landowners whose rights had not been adjudicated were not foreclosed from asserting a claim in the future.

¶ 44 This appeal and cross-appeal followed.

## II. Analysis

¶ 45 Ranch Owner presents six claims on appeal, contending that (1) the trial court's opt-out identification process on remand violated the supreme court's mandate; (2) the trial court improperly decreed access rights to the Salazar estate portion of the Ranch through the same process used for the mountain tract portion of the Ranch; (3) the trial court erred in limiting the res judicata bar to landowners "personally named and served" in the 1960 Torrens actions, ignoring well-settled Colorado law concerning co-owners and successors; (4) the trial court improperly deprived Ranch Owner of the finality required in a quiet title action pursuant to C.R.C.P. 105 by denying Ranch Owner's request for service by publication at the conclusion of the opt-in process; (5) the trial court improperly refused to apportion landowners' access rights in proportion to their

parcel sizes or implement rules and regulations governing their use to avoid harm to the Ranch; and (6) the trial court improperly refused to bar landowners from exercising access rights on portions of the present-day Ranch that were once part of the dominant estate and, therefore, not subject to the access rights.

¶ 46    Landowners cross-appeal, contending that the trial court's opt-in identification process implemented in 2010 violated the supreme court's mandate.

¶ 47    Before we discuss each issue raised by the parties, we first address whether the trial court properly certified its orders as a final judgment for appeal pursuant to Rule 54(b), as a jurisdictional requirement.

A.    Finality of the Trial Court's Judgment for Appeal

¶ 48    Ranch Owner and landowners contend that the trial court's final judgment is sufficiently final pursuant to Rule 54(b) to confer jurisdiction over the appeal and cross-appeal.  For the reasons set forth below, we agree.

1.    Additional Background

¶ 49    In October 2016, as described in Part I.C, *supra,* the trial court issued a final order that certified all prior orders adjudicating

access rights for landowners as final and appealable pursuant to Rule 54(b). The trial court acknowledged that "there may be additional landowners whose property has access rights that have not yet been adjudicated," but concluded that it had carried out its mandate "as completely as is reasonably possible" and "reached pragmatic finality." The trial court also noted that "the identification process has taken over a decade," and that no new landowner claimants had come forward in the past eight months. It reasoned that the remand proceedings "at some point must be considered final" for appeal, even though any remaining landowner claimants were not foreclosed from coming forward in the future.

¶ 50 In June 2017, this court ordered the parties to show cause as to why Ranch Owner's appeal and landowners' cross-appeal should not be dismissed for lack of jurisdiction. In the show cause order, we noted that the trial court's October 2016 order "does not contain an express determination that there is no just reason for delay and . . . express direction for the entry of judgment," as Rule 54(b) requires for an order to be certified as final and appealable.

## 2. Rule 54(b)

¶ 51 When an action involves multiple parties or multiple claims for relief, Rule 54(b) permits a court to direct entry of a final judgment as to fewer than all claims or parties. Rule 54(b) creates an exception to the general rule that an entire case must be resolved by a final judgment before an appeal is brought. *Grear v. Mulvihill,* 207 P.3d 918, 921 (Colo. App. 2009). Rule 54(b) provides that the court may direct the entry of a final judgment as to fewer than all claims or parties "only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment."

¶ 52 Where multiple parties are involved, a certification under Rule 54(b) is proper when (1) the decision certified is final in the sense of being an ultimate disposition of an individual claim and (2) the trial court determines that there is no just reason for delay in entry of a final judgment on the claim. *See Harding Glass Co. v. Jones,* 640 P.2d 1123, 1125 (Colo. 1982) (describing a three-step process to determine whether Rule 54(b) certification is proper); *see also Lytle v. Kite,* 728 P.2d 305, 308 (Colo. 1986) ("[T]he first prong of the

*Harding Glass* requirements does not apply to a certified decision involving multiple parties.").

¶ 53　Our jurisdiction to entertain an appeal of a decision certified under Rule 54(b) depends upon the correctness of the certification. *Carothers v. Archuleta Cty. Sheriff*, 159 P.3d 647, 651 (Colo. App. 2006). We review de novo the legal sufficiency of the trial court's certification. *Id.*

### 3. The Trial Court Properly Certified Its Orders as Final Judgments for Appeal

¶ 54　We conclude that, under these unusual circumstances, the trial court properly certified its judgment as final pursuant to Rule 54(b). Directed by the supreme court in *Lobato II* to "identify *all landowners* who have access rights," 70 P.3d at 1167 (emphasis added), the trial court spent more than a decade identifying and adjudicating access rights for thousands of landowners in Costilla County. These landowners' claims were definitively resolved by the trial court. *See Harding Glass Co.*, 640 P.2d at 1125 (Rule 54(b) certification requires ultimate disposition of an individual claim). Thus, the first of the two relevant *Harding Glass* requirements is satisfied here.

¶ 55    Next, it is not fatal that the trial court's final order itself did

not include an express finding of no just reason for delay.  *See Cyr*

*v. Dist. Court*, 685 P.2d 769, 770 (Colo. 1984) ("In determining

whether an order constitutes a final judgment, we must look not to

the title of the instrument but to its content.").  At a June 2016

hearing on whether to certify a final judgment pursuant to Rule

54(b), the trial court made an oral finding that this was "a unique

case yet there's no just reason for further delay."  While this express

finding was not included in the trial court's final written order, the

court determined that it had carried out its mandate "as completely

as is reasonably possible" and reasoned that the proceedings "at

some point must be considered final."  In our view, these findings

are the functional equivalent to a finding that there is no just

reason for delay.

¶ 56    Our conclusion is consistent with the purpose of Rule 54(b) —

to avoid undue hardship from a delay in allowing an appeal.  *Allison*

*v. Engel*, 2017 COA 43, ¶ 32.  Remand proceedings in this case

have been ongoing for more than a decade.  Therefore, the equitable

interest in reaching an appealable resolution also weighs in favor of

granting Rule 54(b) certification.  *See Lytle*, 728 P.2d at 309 (stating

that equitable concerns favored resolution of dispute that had been ongoing for nine years).

¶ 57    Finally, Rule 54(b) certification in this case was not premature simply because the trial court had not adjudicated the rights of *all* potential landowner claimants in Costilla County, as the mandate directed. Requiring a comprehensive and complete result as a prerequisite for Rule 54(b) certification under these circumstances would potentially shield the trial court's orders on remand from appellate review indefinitely. This is so because the trial court understood that any additional landowner claimants' rights could not be adjudicated until they came forward on their own — a process with no identifiable end date. But while certain unknown claimants had not had their rights adjudicated when the trial court entered the Rule 54(b) certification, the trial court concluded that it had discharged its mandate to the extent "reasonably possible." With no pending claims for a period of eight months, the trial court was well within its discretion in certifying its orders as final pursuant to Rule 54(b). Indeed, doing so allows this court to review the trial court's conclusion that more comprehensive identification procedures were not reasonably possible, and to determine whether

additional identification procedures are required. If we instead concluded that a comprehensive and complete result was a prerequisite for Rule 54(b) certification, we would be required to remand for the trial court to produce a result that it already concluded was not reasonably possible, without reviewing the propriety of its conclusion in this regard. This would be untenable.

¶ 58   For these reasons, we conclude that the trial court's Rule 54(b) certification was proper and we, therefore, have jurisdiction over this appeal.

B.   Adherence to the Mandate During the Opt-Out Process

¶ 59   As discussed above, the proceedings on remand from 2004 through 2010 comprise the opt-out process. Ranch Owner contends that the trial court contravened the supreme court's mandate on remand during the opt-out process by granting access rights without requiring each claimant to first be notified and then appear to assert a claim or present evidence at a hearing. Ranch Owner argues that the trial court's process on remand violated the mandate by eliminating the landowners' burden to present evidence sufficient to meet their burden of proof, while at the same time

denying Ranch Owner the opportunity to test the evidence of timely settlement or present rebuttal evidence.

¶ 60     We are not persuaded that the trial court's opt-out process was inconsistent with the supreme court's mandate in *Lobato II*.

    1.     The Supreme Court's Mandate and Instructions for Remand

¶ 61     In *Lobato II*, the supreme court provided specific directions to guide the remand proceedings.  It held that, "[b]ecause the plaintiff landowners have prevailed on their claims, [Ranch Owner] now must pay the costs associated with identifying and notifying all persons who have access rights to the Taylor Ranch."  70 P.3d at 1167.  The supreme court then "direct[ed] the trial court to identify all landowners who have access rights to the Taylor Ranch and to enter all necessary and appropriate orders to safeguard these rights."  *Id.* at 1167-68.

¶ 62     The supreme court's opinion further instructed the trial court how to perform the identification on remand.  It held that, "in order to have actual access rights to the Taylor Ranch, landowners must be able to show that their lands were settled at the time of the creation of the Beaubien document in 1863."  *Id.* at 1157.  The supreme court also prescribed the actual mechanics for how

32

landowners were expected to prove their claims on remand. *See id.*
("For practical purposes, this requirement [to show that one's lands
were timely settled] can be established by tracing settlement of
one's property to the time of Gilpin's ownership of the Taylor
Ranch.").

¶ 63     The supreme court also specified the standard of proof and
identified the evidence that would presumptively meet the standard.
It held that, "[u]sing the best available evidence, landowners must
prove by a preponderance of the evidence that their property is
included within the boundaries of property owned or occupied by
settlers during the time of Gilpin's ownership of the lands of the
Sangre de Cristo grant." *Id.* at 1159.

¶ 64     When the supreme court modified its *Lobato II* opinion in
response to the parties' petitions for rehearing, it included a
footnote at the end of the sentence quoted above. That footnote
provided as follows:

> We emphasize that the landowners need not
> prove a marketable chain of title for their
> property. As stated in the text, the landowners
> must use the best available evidence to prove
> their lands are benefited by the easements
> Beaubien granted. From the record before us,
> it appears that the best evidence of benefited

> properties conveyed by Beaubien is the official
> 1894 Costilla County survey and inventory of
> lands held by individuals along the Culebra,
> Vallejos, and San Francisco Creeks.[16] Of
> course, we do not foreclose the landowners
> from presenting other evidence to prove their
> settlement claims.

*Id.* at 1159 n.6.

### 2.    Standard of Review

¶ 65    A trial court's implementation of an appellate mandate is reviewed de novo. *Super Valu Stores, Inc. v. Dist. Court,* 906 P.2d 72, 77 (Colo. 1995); *Hardesty v. Pino,* 222 P.3d 336, 340 (Colo. App. 2009). Where compliance with the appellate mandate requires evidentiary or other post-remand factual determinations by the trial court, we review for an abuse of discretion. *Murray v. Just In Case Bus. Lighthouse, LLC,* 2016 CO 47M, ¶ 16.

### 3.    The Trial Court's Remand Process During the Opt-Out Process Comported with the Supreme Court's Mandate

¶ 66    Ranch Owner contends that the trial court's opt-out process violated the supreme court's mandate. Ranch Owner argues that the trial court should have implemented a process akin to the opt-

---

[16] As mentioned above, the 1894 Costilla County survey is referred to as "Map A and Book E" based on its location in the Costilla County real property records.

in process from the outset, and that the opt-out process was improper for three reasons. Ranch Owner argues that the trial court (1) relied on a conclusive presumption that relieved landowners of their burden of proof; (2) denied Ranch Owner the opportunity to examine the title company or inspect its work; and (3) improperly denied Ranch Owner the opportunity to present rebuttal evidence.

¶ 67    We are not persuaded that the trial court's opt-out process was inconsistent with the mandate. We discuss each specific issue raised by Ranch Owner in turn.

> a.    The Trial Court's Reliance on Map A and Book E During the Opt-Out Process Did Not Violate the Mandate

¶ 68    First, Ranch Owner contends that the trial court's reliance on Map A and Book E evidence established a conclusive presumption that improperly relieved landowners of their burden of proof. We disagree. Instead, we conclude that the trial court's reliance on Map A and Book E was consistent with the supreme court's mandate in *Lobato II*.

¶ 69    In footnote six, which was added to *Lobato II* when it was modified after the parties' petitions for rehearing, the supreme court

held that "landowners need not prove a marketable chain of title for their property." 70 P.3d at 1159 n.6. Additionally, footnote six provided that, "[f]rom the record before us, it appears that the best evidence of benefited properties conveyed by Beaubien is the official 1894 Costilla County survey and inventory of lands." *Id.* As noted, the 1894 Costilla County survey referenced in footnote six is also known as Map A and Book E. Thus, the supreme court identified Map A and Book E as evidence presumptively sufficient (but not necessary) on remand to prove that an owner of a tract of land has rights to access the Ranch.

¶ 70 The relationship between footnote six and landowners' petition for rehearing is also illuminating. In their petition, landowners asked the supreme court to "clarify the mechanism of proof that plaintiffs can use on remand to establish their claims." Landowners "requested confirmation" that they would be able to "satisfactorily meet the Court's requirement by presenting the best proof available of locations of land" settled in the time of Gilpin, "and that plaintiffs currently own or possess such tracts or portions thereof." Landowners noted that the results of the 1894 Costilla County survey "are contained in" Map A and Book E, and that they were

"deeply concerned" that, on remand, Ranch Owner would argue "that each Plaintiff claiming access rights must individually produce a formal abstract or similar evidence containing a complete chain of title," notwithstanding that "[s]uch information is what Map A and Book E officially catalogued."

¶ 71    When the supreme court subsequently modified *Lobato II*, it added the statement prescribing the burden of proof that Ranch Owner contends was improperly lightened on remand: "Using the best available evidence, landowners must prove by a preponderance of the evidence that their property is included within the boundaries of property owned or occupied by settlers during the time of Gilpin's ownership of the lands of the Sangre de Cristo grant."  70 P.3d at 1159.  The supreme court appended footnote six to this sentence, stating that the "best evidence" in the record to meet this standard is Map A and Book E.  *Id.* at 1159 n.6.

¶ 72    Because the supreme court's identification of Map A and Book E as the "best evidence" appears to directly respond to landowners' request to clarify the "mechanism of proof" that would be sufficient on remand, we conclude that the trial court's reliance on Map A and Book E was consistent with the mandate.  For this reason — and

also because we conclude, as discussed below, that Ranch Owner was not denied the opportunity to challenge the Map A and Book E evidence before the trial court decreed access rights — we are not persuaded by Ranch Owner's contention that the trial court improperly relied on a conclusive presumption that current owners of any property within the Map A and Book E record had access rights.

b. Any Restrictions Placed By the Trial Court on Discovery of a Court-Appointed Expert Do Not Warrant Reversal

¶ 73 Second, Ranch Owner contends that the trial court improperly denied Ranch Owner the opportunity to depose or otherwise examine any representative of the title company during the remand proceedings or inspect the title company's work product. We conclude that, even assuming the trial court erred by denying the parties access to a representative of the title company for depositions or other discovery, any error was harmless.

¶ 74 The trial court appointed the principal of the title company as "an abstractor to advise the Court by written report" of the present-day landowners whose property was settled in the time of Gilpin. Out of concern that allowing direct contact with title company

38

personnel would "interfere with" the title company's work, the trial court barred the parties from deposing or otherwise directly contacting representatives of the title company. The court instead interposed itself between the parties and the title company, describing the title company's process to the parties and inviting them to submit questions, which the trial court would then raise with the title company's representatives. In prohibiting the parties from contacting representatives of the title company, the trial court also found that the title company's reports were "self-explanatory" and provided "the background information for each one of the tracts."

¶ 75    In its order of appointment, the trial court made no reference to CRE 706, but we conclude that the principal of the title company acted as a court-appointed expert witness pursuant to that rule. *See* CRE 706(a) ("The court may appoint any expert witnesses agreed upon by the parties, and may appoint expert witnesses of its own selection."). CRE 706 is essentially identical to Federal Rule of Evidence 706, and "when the Colorado and Federal Rules of Civil Procedure are essentially identical, case law interpreting the federal rule is persuasive in analysis of the Colorado rule," *Forbes v.*

*Goldenhersh*, 899 P.2d 246, 249 (Colo. App. 1994) (citing *Harding Glass*, 640 P.2d at 1125 n.3). Both rules authorize the parties to depose and cross-examine a court-appointed expert. *See* Fed. R. Evid. 706(b)(2), (b)(4); CRE 706(a). But these discovery requirements are inapplicable to court-appointed "advisors or consultants." *Reilly v. United States*, 863 F.2d 149, 155 (1st Cir. 1988). The line between "advisors or consultants" and expert witnesses is drawn based on whether the appointee "contribute[s] new evidence." *Id.* at 156; *see also Ass'n of Mexican-Am. Educators v. California*, 231 F.3d 572, 590-91 (9th Cir. 2000) (deciding that court appointee not subject to Fed. R. Evid. 706 where court never relied on appointee "as a source of evidence"). Here, because the trial court relied on the title company as a source of evidence, it was not acting simply as an advisor or consultant. Thus, the trial court's decision to prohibit the parties from examining representatives of the title company seems to have been contrary to CRE 706(a).

¶ 76 Nevertheless, Ranch Owner has not identified any prejudice that resulted from the trial court's decision to limit access. Indeed, the record belies Ranch Owner's contention that it was denied the

40

opportunity to inspect the title company's work product. The title company's reports were available for Ranch Owner's inspection, and the trial court provided time after each status conference for Ranch Owner to raise questions about the title company's process. Moreover, Ranch Owner has not identified any error in the title company's work, nor any tract of land that was improperly granted access. Accordingly, because we cannot discern what, if any, information Ranch Owner could have acquired only through examination of the title company's representatives and not through other means, any error by the trial court is harmless.

¶ 77 We are also not persuaded by Ranch Owner's argument that being precluded from examining the principal of the title company prevented it from challenging the presumption that all of the land in the Map A and Book E area was timely settled. Ranch Owner's argument in this regard appears to conflate the significance of the title company's reports with that of the Map A and Book E evidence. The title company identified the owners and current descriptions of properties within the bounds of the land presumed to be timely settled (i.e., land on Map A). It did not determine that these properties were or were not timely settled. Thus, Ranch Owner's

inability to examine a title company representative about these reports would not have prejudiced Ranch Owner's ability to challenge the presumption that lands within Map A and Book E were timely settled. Moreover, any such issue was mooted by Ranch Owner's eventual stipulation to the timely settlement of all Map A lands.

c.    The Trial Court Did Not Deny Ranch Owner the Opportunity to Present Rebuttal Evidence to Map A and Book E

¶ 78    Next, Ranch Owner contends that the trial court denied it the opportunity to present rebuttal evidence to challenge the timely settlement of the area covered by Map A and Book E. We conclude that this contention is unsupported by the record.

¶ 79    In January 2015, Ranch Owner ultimately stipulated that all lands within Map A and Book E,[17] as well as certain lands outside that area, were timely settled. Ranch Owner contends that the stipulation does not preclude this argument on appeal because the stipulation contained a clause reserving Ranch Owner's "right to appeal any and all rulings, orders or determinations" entered on

---

[17] At oral argument, both sides agreed that all of the Map A and Book E land is included in the map of Stipulated Settled Lands.

42

remand, including "those that determined . . . whether the Stipulated Settled Lands are part of the Burdened Property." We are not persuaded that Ranch Owner's reservation of the right to appeal the trial court's orders nullifies its unambiguous stipulation to a *factual* matter — that is, that the lands identified in the stipulation were timely settled. To the extent Ranch Owner now argues that it was prejudiced because the trial court prevented it from presenting evidence to rebut the presumption that Map A and Book E lands were timely settled, we conclude that Ranch Owner's contention is foreclosed by Ranch Owner's eventual stipulation to that very fact.

¶ 80 The record further belies Ranch Owner's claim that it was prevented from presenting rebuttal evidence. On appeal, Ranch Owner points to just one piece of evidence that it contends the trial court did not allow it to present — a 1913 survey of Costilla County. Ranch Owner contends that it was "prepared to present" the 1913 survey to challenge the presumption that all land in Map A and Book E was timely settled. Ranch Owner cites to a February 2005 brief where counsel argued that, "[i]f an opportunity to present evidence would be afforded as [Ranch Owner] has requested,"

Ranch Owner "would be prepared to present evidence, including a 1913 survey of the county that resulted in a substantial reduction of the vara strip area, that would contest the settlement of various lands." Ranch Owner, however, does not cite to any hearing or other portion of the record where Ranch Owner actually requested that the trial court consider the 1913 survey as evidence, or where it provided the trial court with an offer of proof as to what the 1913 survey would show.

¶ 81 Nor does Ranch Owner cite to any portion of the record where the trial court denied Ranch Owner's request to present the 1913 survey or other evidence. Ranch Owner contends that the trial court did not allow it to present evidence challenging the Map A and Book E presumption, but only cites to a March 2005 order in which the trial court concluded that all tracts in the 2004 Duncan Report were timely settled and found that Ranch Owner "presented no competent evidence to the contrary." This order does not support Ranch Owner's contention that it tried but was not allowed to present the 1913 survey as evidence.

¶ 82 Additionally, the record shows that the trial court accepted and considered evidence from Ranch Owner in the form of an offer

of proof before it decided that the landowners in the 2004 Duncan Report had access rights. Ranch Owner's offer of proof included evidence of personal service in the 1960 Torrens actions on certain landowners, offered by Ranch Owner to show that their successors should be subject to the res judicata bar. The trial court advised Ranch Owner that, if it wished the trial court to reconsider its ruling (that landowners in the 2004 Duncan Report had access rights), Ranch Owner could "expand upon [its] offer of proof." But Ranch Owner did not thereafter supplement its offer of proof or request to present additional evidence.

¶ 83 For these reasons, we conclude that the trial court followed the mandate during the opt-out process. As described above, the trial court's identification of landowners based on Map A and Book E did not establish a conclusive presumption, and Ranch Owner was not precluded from presenting evidence to rebut the Map A and Book E presumption of timely settlement. And while the trial court may have erroneously restricted discovery of its court-appointed expert, any such error was harmless.

C.    Inclusion of the Salazar Estate in Remand Proceedings

¶ 84    Ranch Owner next contends that the trial court's reliance on the same process on remand to decree rights to both the Salazar estate and the mountain tract portions of the Ranch was improper because it failed to consider the Salazar estate's distinct factual and procedural history and was premised on findings pertaining only to the mountain tract portion.  We disagree.

1.    Additional Background

¶ 85    In 1960, Taylor purchased the roughly 77,000 acres comprising the mountain tract of the Ranch.  In 1973, Taylor purchased an adjoining parcel of roughly 2500 acres that was also part of the Sangre de Cristo grant.  These 2500 acres comprise the Salazar estate.  *See Lobato I*, 71 P.3d at 943-44.

2.    The Trial Court Properly Included the Salazar Estate in Remand Proceedings

¶ 86    Ranch Owner's argument is foreclosed by the supreme court's mandate.  In *Lobato I,* the supreme court specifically held that the mountain tract and the Salazar estate together comprised the Taylor Ranch.  71 P.3d at 944 ("Together, the mountain tract and the Salazar estate are known as the Taylor Ranch.").  Ranch Owner

46

argued in its *Lobato II* brief that the Salazar estate should not be a part of the case. But the supreme court in *Lobato II* reiterated that "the Taylor Ranch includes those lands known as the Salazar estate" and held that, "[a]s such, our decision in the present case also applies to the Salazar estate." 70 P.3d at 1155 n.1. Thus, we conclude that the supreme court has considered and rejected Ranch Owner's argument, and neither the trial court nor this court is free to revisit it. *See People v. Roybal*, 672 P.2d 1003, 1005 (Colo. 1983) ("The law of the case as established by an appellate court must be followed in subsequent proceedings before the trial court.").

## D. Res Judicata

### 1. Ranch Owner's Contentions

¶ 87 Ranch Owner contends that the trial court erroneously limited the application of res judicata to landowners who received personal service in the 1960 Torrens actions and their successors. Ranch Owner contends that it is well settled under Colorado law that (1) a person may consent to personal jurisdiction — thereby waiving any due process notice requirements — through participation in the litigation; and (2) a res judicata bar applicable to one person also bars anyone in privity with that person. Ranch Owner argues that

47

the trial court erroneously refused to apply res judicata to landowners under these circumstances, notwithstanding the supreme court's holding that "individuals who should have been personally named and served, and were not, are not barred from presently bringing such claims." *Lobato II*, 70 P.3d at 1158. We conclude that Ranch Owner's arguments are foreclosed by the supreme court's mandate and the law of the case, as established in *Lobato II*.

### 2. The Trial Court Properly Denied Ranch Owner's Motion for Broader Application of Res Judicata

¶ 88    Ranch Owner's first argument — that res judicata must apply to landowners who participated in the 1960 Torrens actions and their successors — was considered and rejected by the supreme court in *Lobato II*. Ranch Owner advanced this argument in its *Lobato II* brief, arguing then that personal jurisdiction and proper service should both be presumed for any landowner who participated in the 1960 Torrens actions, even absent personal service. Ranch Owner specifically argued that "[t]he appearances by counsel [for landowners] eliminated the necessity for personal service on all defendants individually named in the Torrens action."

But this argument did not carry the day. Instead, the supreme court held that "the claims made by all present-day landowners or their predecessors in title not personally named or served in the 1960s Torrens action are not barred." *Lobato II*, 70 P.3d at 1165. This holding was a rejection of Ranch Owner's argument that a landowner's participation in the 1960 Torrens actions was sufficient for due process purposes to overcome the absence of personal service.

¶ 89    The supreme court's analysis in *Lobato II* provides further support for our conclusion. After determining that, "[t]o have a preclusive effect on the landowners' current claims, Taylor's Torrens judgment must satisfy the minimum procedural requirements of the Due Process Clause of the Fourteenth Amendment," *id.* at 1160, the supreme court held that "the Torrens bar on future challenges cannot be sustained where constitutional deficiencies of notice are present." *Id.* Because the supreme court relied on the presence of "constitutional deficiencies of notice" to hold that due process limited the application of the res judicata bar, we conclude that the supreme court intended to limit the application of res judicata to landowners who received personal service — without regard to

whether they participated in the litigation. *See Hardesty*, 222 P.3d at 340 ("[B]oth an appellate holding and its necessary rationale become law of the case controlling future proceedings.").

¶ 90     As to Ranch Owner's second argument, we conclude that the application of the res judicata bar to landowners whose co-owner was personally served in the 1960 Torrens actions is also foreclosed by the law of the case under *Lobato II*. In denying Ranch Owner's request for a hearing on res judicata issues, the trial court reasoned that the supreme court "continually made the declaration that those persons personally named and served were the only ones who would be barred by res judicata." Indeed, the supreme court reiterated its specific holding that res judicata applied only to landowners "personally named and served" on at least five occasions throughout its *Lobato II* opinion. The fact that Ranch Owner did not make the specific argument it advances now prior to the supreme court deciding *Lobato II* does not prevent such a contention from being foreclosed by the supreme court's holding. *See Hardesty*, 222 P.3d at 341 (On remand, an appellate holding is not limited to its specific rationale "because the decided 'issue may be broader than the specific arguments addressed to the court of

appeals.'" (quoting 18B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4478.3, at 759-60 (2d ed. 2002))).

¶ 91    In summary, the supreme court made clear that the res judicata bar only extended to landowners and successors who were "personally named and served" in the 1960 Torrens actions, and the trial court was not free to disregard or modify this language.  Nor are we.

## E.    Service by Publication

¶ 92    Ranch Owner next contends that the trial court's denial of its motion to serve any remaining unknown claimants with notice through publication was error because it prevented Ranch Owner from achieving the finality required of a quiet title action under Rule 105.  We disagree.

### 1.    Additional Background

¶ 93    As described in Part I.C, *supra,* the trial court denied Ranch Owner's request at the outset of the remand proceedings to personally serve all Costilla County landowners with notice of their obligation to come forward and assert a claim to access the Ranch. The trial court decided instead to proceed with an opt-out process,

which it began by identifying landowners with access rights based upon the Map A and Book E record, and only notified landowners after their rights were adjudicated. At the conclusion of the opt-out process, the trial court initiated the opt-in process, during which all Costilla County landowners were mailed notices advising of the ongoing proceedings but informing each landowner that his or her right to make a future claim would not be foreclosed by a failure to respond.

¶ 94    At the conclusion of the opt-in process, Ranch Owner sought to achieve finality through service of notice by publication to all remaining, unidentified claimants. Ranch Owner did not renew its request to personally serve all Costilla County landowners — or even the subset of landowners whose claims had not been adjudicated. In fact, Ranch Owner indicated that it would "resist" any such approach. The trial court denied Ranch Owner's request for service by publication, concluding that it would violate the supreme court's mandate by extinguishing the rights of any non-responding claimants without first personally serving them. We discern no error on the part of the trial court in this regard.

## 2. The Trial Court Properly Denied Ranch Owner's Request to Achieve Finality Through Service by Publication

¶ 95 Ranch Owner contends that the trial court's refusal to allow service by publication on unknown parties who may in the future claim an interest in the Ranch deprived Ranch Owner of the complete and final adjudication that Rule 105 requires in a quiet title action. *Lobato II*, 70 P.3d at 1165. Ranch Owner argues that the due process concerns identified by the supreme court in *Rael*, 876 P.2d 1210, *Lobato I*, and *Lobato II* were satisfied through the trial court's exhaustive, decade-long efforts to identify potential claimants and decree access rights and that, because the trial court had concluded that process, service by publication was an appropriate method to achieve finality.

¶ 96 Landowners respond that service by publication, because it would extinguish the rights of any landowner who did not respond, would violate the supreme court's mandate in *Lobato II*, which held that personal service was required before any landowner's rights to access the Ranch could be extinguished. Landowners also argue that the general requirement that a quiet title action completely

53

adjudicate the rights of all interested parties is not applicable here because the property rights at issue are not mutually exclusive.

¶ 97 We agree with landowners that Ranch Owner's requested service by publication would have violated the supreme court's mandate in *Lobato II*, and, therefore, we conclude that the trial court properly denied Ranch Owner's request.

¶ 98 The supreme court's mandate in *Lobato II* required Ranch Owner to first attempt to personally serve all Costilla County landowners before the requirements of procedural due process would allow any landowner's rights to be extinguished utilizing a lesser form of service. *Lobato II*, 70 P.3d at 1165. With respect to the 1960 Torrens action, the supreme court held that "[u]nder the circumstances of this unique case, reasonable diligence required that Taylor personally name and serve all landowners in Costilla County." *Id.* at 1164. Because the supreme court found that the names and addresses of all landowners in Costilla County were "reasonably ascertainable" through public tax records, it held that Taylor failed to exercise reasonable diligence when he resorted to publication service without first attempting to effectuate personal service. *Id.* at 1164-65; *see also Weber v. Williams*, 137 Colo. 269,

54

276, 324 P.2d 365, 368 (1958) ("The law requires that personal service shall be had whenever it is obtainable."). The same was just as true at the end of the opt-in process as it was in 1960. After the conclusion of the identification process on remand, Ranch Owner never renewed its request to personally serve all Costilla County landowners whose claims had not been adjudicated.

¶ 99    Nor are we persuaded that the due process concerns identified by the supreme court were satisfied upon completion of the trial court's identification process on remand. Ranch Owner argues that service by publication was appropriate because, upon completion of the trial court's identification process, reasonably diligent efforts had been made to personally serve all potential claimants who were reasonably ascertainable. But this contention is not supported by the record and is contrary to the supreme court's express holding that reasonable diligence requires an attempt to achieve personal service on all Costilla County landowners, whose names and addresses are reasonably ascertainable from public records. *See Lobato II*, 70 P.3d at 1164. At the conclusion of the trial court's process, personal service on all landowners identified in public records would have achieved finality without violating the due

process rights of Costilla County landowners, but Ranch Owner did not ask the trial court to proceed in that manner. Because it was not within the trial court's discretion to alter or disregard the supreme court's mandate and authorize publication notice in the absence of reasonable diligence by Ranch Owner as understood in the context of *Lobato II*, the trial court correctly concluded that publication notice (without first attempting personal service) would be contrary to the appellate mandate and the law of the case.

¶ 100 We are not persuaded otherwise by Ranch Owner's argument that the trial court's refusal to authorize publication notice prevented the finality required in a quiet title action under Rule 105. To the extent Rule 105 conflicts with the supreme court's holdings and mandate, the mandate controls. *See Roybal*, 672 P.2d at 1005 ("The law of the case as established by an appellate court must be followed in subsequent proceedings before the trial court."); *see also Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the

case which directly controls, leaving to this Court the prerogative of overruling its own decisions.").

### F. Apportionment of Rights and Rules Governing Use

¶ 101 Ranch Owner next contends that the trial court erroneously refused to apportion each landowner's access right in proportion to the size of each subdivided parcel. Apportionment is necessary, Ranch Owner argues, to avoid imposing an unsustainable burden on the Ranch. Ranch Owner also contends that the trial court erroneously refused to further define the scope of the access rights and impose rules and regulations for their exercise. Landowners respond that Ranch Owner failed to prove actual overuse by any landowner and so was not entitled to relief for an injury that had not yet occurred nor was demonstrably imminent. We are not persuaded that the trial court abused its discretion in declining to apportion access rights or impose rules and regulations to govern landowners' exercise of their rights.

### 1. Additional Background

¶ 102 In *Lobato I,* the supreme court held that landowners had implied rights to the Ranch in three forms: "a prescriptive easement, an easement by estoppel, and an easement from prior

use." 71 P.3d at 946. It held that the extent of landowners' access rights was determined by "the rights memorialized in the Beaubien Document" and, therefore, included rights to access the Ranch for pasture, firewood, and timber. *Id.* at 956. The supreme court further held that landowners' use of the Ranch must comport with a reasonable use standard, under which their use must be

> limited to reasonable use — the grazing access is limited to a reasonable number of livestock given the size of the vara strips; the firewood limited to that needed for each residence; and the timber limited to that needed to construct and maintain residence and farm buildings located on the vara strips.

*Id.*

¶ 103    In 2004, at the outset of the proceedings on remand, landowners filed a motion to enforce the reasonable use standard. The trial court granted the motion in part. It found that landowners' "grazing right of access is limited to reasonable use of livestock given the size of the vara strips" under the reasonable use standard, and that the Beaubien Document authorized grazing "for the purpose of survival or for household use." In addition, the trial court found that "[h]ousehold use does not include commercial use," and that "commercial use" is a use "made and done or

operated primarily for profit." It then concluded that "[a]t this time . . . there is no legal basis to deny enforcement of these access rights," but it noted that, once the trial court's identification process "has matured, [if] the Ranch Owner Defendants reasonably believe that Plaintiffs are not in compliance with the Supreme Court's standards then they may seek further relief."

¶ 104    A year later, Ranch Owner filed a motion requesting "further clarification and definition of scope of access rights," alleging that landowners' use of the Ranch violated the supreme court's reasonable use standard. Ranch Owner's motion was supported by an affidavit from a ranch manager, averring that the Ranch had a grazing capacity of 470 animal units at 60 acres to the animal unit.[18] Ranch Owner submitted a second affidavit from another ranch manager attesting that, as of August 2004, one landowner was grazing 51 animal units, and that this landowner, along with two others,[19] was grazing 107 animal units on the 2500-acre

---

[18] According to the affidavit, a single animal unit is comprised of one cow and one calf, or five sheep. One bull counts as 1.5 animal units.

[19] These landowners' access rights were decreed in June 2004 and were limited to the Salazar estate.

Salazar estate. Ranch Owner argued that the identified uses exceeded the reasonable use standard.

¶ 105   Ranch Owner further asserted that it had "met repeatedly with the Lobato plaintiffs and other plaintiffs and have been able to work out numerous issues" concerning grazing practices, but that other issues were not amenable to informal resolution and would compound as additional access rights were decreed. Ranch Owner, therefore, sought the issuance of several remedial orders. Specifically, Ranch Owner requested orders (1) tying each landowner's right to a legal description of his or her property; (2) apportioning each landowner's right in proportion to the subdivision of the original benefited vara strip parcel; (3) providing rules, regulations, and guidelines to govern access and use of the Ranch; and (4) designating a group to represent the landowners in negotiations.

¶ 106   At a hearing on the issue, the trial court denied Ranch Owner's motion. The trial court found that there was no evidence of an adverse effect from landowners' grazing practices and ruled that it would not grant Ranch Owner's requested prospective relief. It also found that "the interest of the current property owners is so

fragmented as it relates to the original settlers that . . . [it] makes the creation of rules based on apportion[ment] impossible."

¶ 107    In 2006, Ranch Owner filed a motion seeking "to limit the extent of use of the Ranch based on the size of the property granted access." Ranch Owner argued that apportionment was necessary because the Ranch would be overburdened if even a fraction of the landowners granted access rights to date were to graze livestock "as if they have the whole of the original right that was appurtenant to the original vara conveyance." Ranch Owner requested that the trial court limit each landowner's rights based on the size of his or her parcel, and also order that each landowner desiring to access the Ranch must complete a form identifying his or her property and the extent of his or her intended use. Ranch Owner asserted that the information on the form would allow it to determine whether there was a basis to object to the intended use as beyond the scope of the landowner's parcel.

¶ 108    At a hearing, the trial court granted Ranch Owner's request to require landowners to complete an intended-use form. It then reiterated that landowners' use of the Ranch was limited to "reasonable use based upon the size of the original parcel conveyed

by Mr. Beaubien," and encouraged the parties to resolve land use issues between themselves. Beyond that, however, the trial court refused to enter further orders.

¶ 109 A few months later, the trial court approved a "Notice of Intended Use" form that landowners would be required to complete. The trial court required landowners to complete the Notice of Intended Use form as a prerequisite to access by describing their property ownership and their intended use of the Ranch. The trial court also ruled that Ranch Owner could not limit access to the Ranch because of the information provided on the Notices without further order of the court. But Ranch Owner could use the information on the form to seek relief from the trial court through a separate abuse or trespass action. Nothing in the record indicates that Ranch Owner has done so thus far.[20]

¶ 110 Later that year, Ranch Owner moved for the trial court to hold an evidentiary hearing to determine the grazing capacity of the Ranch. Landowners opposed the requested hearing, arguing that

[20] At a February 2009 hearing, Ranch Owner's counsel advised the court that "[t]he Notice of Intended Use forms have been in place for two years. The ranch owner has found the returns of those forms incredibly useful, with respect to the grazing numbers especially."

Ranch Owner failed to present evidence of actual overburdening of the Ranch. In support of their position, landowners submitted an affidavit from an expert attesting that the historical grazing practices on the Ranch greatly exceeded Ranch Owner's estimate of the Ranch's total grazing capacity. Landowners further argued that a determination of grazing capacity was outside the scope of the mandate on remand and would delay the trial court's completion of the identification process.

¶ 111 The trial court denied Ranch Owner's motion without a hearing. In a written order, the trial court found that the grazing capacity of the Ranch was dependent on seasonal weather conditions and, therefore, "an order issued today may not serve the interest of justice in the ensuing years." It also found that the issue did not implicate an issue of fact common to all class members. It advised that, instead of a hearing, Ranch Owner should use the Notices of Intended Use to determine whether to pursue claims for overuse or abuse of access rights against individual landowners, such as in a trespass action. To date, no such claim has been asserted.

## 2.    Legal Principles

¶ 112    Access rights must be apportioned when necessary to avoid "an unreasonable increase in the burden on the servient estate." *See* Restatement (Third) of Property: Servitudes § 5.7(1) (Am. Law Inst. 2000) (hereinafter Restatement).  Easement holders are not permitted to "cause unreasonable damage to the servient estate or interfere unreasonably with its enjoyment."  *Id.* § 4.10.  When a benefited property has been subdivided, "[e]ach separately owned parcel is entitled to make the uses privileged by an easement or profit; provided, however, that if apportionment is required to avoid an unreasonable increase in the burden on the servient estate, the use rights are appropriately apportioned among the parcels."  *Id.* § 5.7(1).

¶ 113    A benefited property may expand its use of an easement without creating an unreasonable burden.  *Wright v. Horse Creek Ranches*, 697 P.2d 384, 388-89 (Colo. 1985) ("[T]he beneficiary of an easement established by prescription will be permitted to vary the use of the easement to a reasonable extent.").  The "manner, frequency, and intensity of the use may change over time," for example, "to accommodate normal development of the dominant

64

estate." Restatement § 4.10; *see also Westland Nursing Home, Inc. v. Benson*, 33 Colo. App. 245, 252, 517 P.2d 862, 867 (1974) (same).

¶ 114 In determining whether "an additional use of the servient estate is permissible," a court should compare "the use originally acquired and the additional use," giving consideration to "their purpose, the normal evolution in the use of the dominant estate, and the relative burden to the servient estate." 4 Herbert Tiffany, *Real Property* § 1209, Westlaw (3d ed. database updated Sept. 2018).

### 3. Standard of Review

¶ 115 While a trial court's implementation of an appellate mandate is reviewed de novo, *see Super Valu*, 906 P.2d at 77, evidentiary or other post-remand factual determinations are reviewed for abuse of discretion, *Murray*, ¶ 16.

### 4. The Trial Court Did Not Abuse Its Discretion by Denying Ranch Owner's Requests for Apportionment and Establishment of Rules

¶ 116 Ranch Owner contends that the trial court improperly refused to apportion landowners' rights to access the Ranch or establish a management plan to govern consumption of its resources. Ranch

Owner contends that the trial court disregarded evidence that landowners' livestock grazing overburdened the Ranch, failed to enforce the supreme court's mandate requiring entry on remand of all necessary orders to safeguard landowners' rights to use the Ranch, and ignored fundamental tenets of easement law under which the trial court was obligated to issue orders designed to limit the additional burden imposed on the Ranch. Ranch Owner also contends that, because the trial court found that apportionment would be impossible under the circumstances, it was required to extinguish landowners' access rights. We are not persuaded. We discuss each of Ranch Owner's contentions in turn.

¶ 117 First, the record does not support Ranch Owner's contention that the trial court disregarded evidence showing that landowners' grazing of livestock overburdened the Ranch. Ranch Owner's March 2005 motion, which Ranch Owner points to on appeal as support for this claim, presented evidence that four landowners had each grazed between twenty-three and fifty-one livestock animal units at one time. Ranch Owner also submitted an affidavit from its ranch manager estimating the grazing capacity of the Ranch. In its 2005 motion and on appeal, Ranch Owner's claim that it has

demonstrated actual overuse of the Ranch amounts to a claim that landowners' grazing practices exceed Ranch Owner's estimate of the Ranch's capacity. Neither Ranch Owner nor the ranch manager's affidavit asserted that these grazing practices had caused actual harm to the Ranch — only that such harm was inevitable if the trial court did not apportion rights and set rules. Ranch Owner's claims of harm to the Ranch are belied by the fact that, even though landowners have been required since 2006 to complete forms describing their intended use of the Ranch in order to gain access to the Ranch, Ranch Owner has not asserted any specific claims of actual overuse.

¶ 118    Nor are we persuaded by Ranch Owner's contention that the sheer number of parcels and landowners granted access rights was sufficient to conclude that the Ranch was subject to an unreasonable increase in burden. Generally, an "increase in the number of persons holding the benefit of the servitude alone does not constitute an unreasonable increase in the burden," even though such an increase may subject the servient estate owner to a "greater number of enforcement actions and higher transaction

costs in negotiating with the benefit holders." Restatement § 5.7 cmt. c.

¶ 119    In short, because the record does not show that Ranch Owner ever presented evidence of actual or imminent overuse, we cannot agree with Ranch Owner's contention that the trial court was required to consider the remedy of apportionment in order to avoid damage to the Ranch's resources. That injury was unsubstantiated in the eyes of the trial court. We perceive no abuse of discretion in that conclusion.

¶ 120    Second, we are not persuaded that the supreme court's mandate required the trial court to apportion rights or establish the rules Ranch Owner requested. Ranch Owner points to the supreme court's instruction for the trial court on remand to "identify all landowners who have access rights to the Taylor Ranch *and to enter all necessary and appropriate orders to safeguard these rights.*" *Lobato II*, 70 P.3d at 1167-68 (emphasis added). For an apportionment order to have been necessary to "safeguard" landowners' access rights, however, Ranch Owner would have needed to show that landowners' use had caused actual harm to the Ranch or that risk of such harm was imminent. For the

reasons described above, we conclude that the trial court did not abuse its discretion in determining that Ranch Owner failed to make this threshold showing.

¶ 121 Third, we disagree with Ranch Owner that principles of easement law required the trial court to apportion landowners' access rights or set the rules and regulations Ranch Owner requested. Ranch Owner argues that there is an unreasonable increase in the burden on the Ranch because it is reasonable to assume that, had the landowners' use of the Ranch increased from the original 170 parcels to 6000 parcels during the original prescriptive period, such an increase would have prompted the owner of the Ranch at that time to interrupt the use, thus limiting the extent of landowners' prescriptive right. Because this standard applies only to prescriptive easements, we need not address this argument.

¶ 122 The supreme court held that landowners had established "a prescriptive easement, an easement by estoppel, and an easement from prior use." *Lobato I*, 71 P.3d at 946. With respect to the prescriptive easement, the supreme court held that landowners satisfied the requirement of continuous use for the prescriptive

period through their continuous access to the Ranch "from the 1800s to the date the land was acquired by the defendant, in 1960." *Id.* at 954. We offer no opinion as to whether it is reasonable to assume that the owner or owners of the Ranch would have interrupted landowners' use had landowners' property been subdivided then to the extent that it is today. Instead, we conclude that, even if we assume that an unreasonable increase in burden exists with respect to landowners' prescriptive easement, their increased use remains within the scope of the other two easements the supreme court recognized.

¶ 123    "[P]recise delineation of the means by which a particular easement is acquired is critical to any determination of the extent to which the owner of the dominant estate is entitled to burden the servient estate." *Wright,* 697 P.2d at 388. In *Lobato I,* the supreme court held that landowners had an easement by estoppel in part because Ranch Owner's predecessors allowed access to the Ranch for the purpose of inducing landowners to establish new settlements on adjacent land, and such rights were necessary for any settlement to succeed. *See* 71 P.3d at 955. Moreover, because "[a] servitude should be interpreted to give effect to the intention of

70

the parties ascertained from . . . the circumstances surrounding creation of the servitude" and "to carry out the purpose for which it was created," we are especially reluctant to conclude that landowners' use of the Ranch is either unreasonable or unforeseen based on the fact that the original settlement has survived and grown since the 1860s. Restatement § 4.1(1); *see also id.* § 4.10 cmt. b ("In resolving conflicts among the parties to servitudes, the public policy favoring socially productive use of land generally leads to striking a balance that maximizes the aggregate utility of the servitude beneficiary and the servient estate."). Nor has Ranch Owner persuasively argued that the increase in use of the Ranch establishes an unreasonable increase in burden under any test applicable to an easement by estoppel or easement based on prior use.

¶ 124    Applying easement law principles, the increased use of the easement by present-day Costilla County landowners as compared to the original settlers does not represent a change in the kind of use, which would be disfavored, but instead a change in the degree of use. Where only the degree of use is changed, this favors a finding that the current degree of use is within the scope of the

easement. *See Clinger v. Hartshorn*, 89 P.3d 462, 467 (Colo. App. 2003) (affirming defendants' right to increased use of prescriptive easement and distinguishing *Wright*, 697 P.2d 384, on the basis that "[*Wright*] involved a change in kind, rather than in degree, of use"); *Hayes v. City of Loveland*, 651 P.2d 466, 468 (Colo. App. 1982) (holding that construction of power line on easement acquired by prescription was within the scope of the easement because it represented "a change in the degree of use, not the kind of use").

¶ 125    Fourth, Ranch Owner's contention that the trial court was required to extinguish landowners' access rights because it found apportionment to be "impossible" is unpersuasive. The comments to the Restatement acknowledge that "[i]f there is no practical means of apportionment . . . modification or termination of the easement *may be appropriate* under § 7.10 (changed conditions)." Restatement § 5.7 cmt. c (emphasis added). But the question of whether apportionment is practicable cannot arise until after a finding has been made that apportionment is required. Here, because Ranch Owner has not shown that landowners' use imposes

72

an unreasonable increase in the burden on the Ranch, the question of whether apportionment is possible is not yet relevant.

¶ 126    For these reasons, we conclude that Ranch Owner did not show that the increased use of the Ranch as a result of the access rights granted on remand resulted in an unreasonable increase in the burden. Accordingly, the trial court did not abuse its discretion in denying Ranch Owner's request for apportionment or establishment of rules and regulations.

G.    Rights to Access Original Vara Strips that Are Now Located Within the Ranch

1.    Additional Background

¶ 127    The title company's November 2006 report showed that certain portions of the Ranch were once vara strip parcels benefited by Beaubien's grant. Ranch Owner later hired a surveyor to confirm the title company's finding. Ranch Owner contends that the trial court erroneously refused to prohibit landowners from exercising their access rights on these portions of the Ranch. Ranch Owner argues that because it is undisputed that a landowner's access rights cannot be exercised over another vara strip parcel, any portions of the Ranch that were original vara strip parcels must be

73

excluded from the servient estate.  Landowners respond that Ranch Owner waived this argument by failing to raise it earlier in the litigation.  Ranch Owner replies that it could not have raised the argument earlier because prior to *Lobato II* it could not have known that access rights would be tied to original vara strip parcels.  We perceive no error by the trial court.

### 2. Ranch Owner's Requested Determination Was Outside the Scope of the Mandate

¶ 128    As discussed above, the supreme court's mandate required the trial court on remand to determine the scope of the dominant estate.  But the supreme court's opinions in *Lobato I* and *Lobato II* determined the scope of the servient estate, holding that the entire Taylor Ranch was burdened.  Thus, the trial court did not have discretion to revisit the issue of what constituted the servient estate.  *See Roybal*, 672 P.2d at 1005.  Accordingly, the trial court did not err in declining to redefine the servient estate.

### H. Adherence to the Mandate During the Opt-In Process

¶ 129    In their cross-appeal, landowners contend that the trial court violated the *Lobato II* mandate by requiring certain individual Costilla County landowners to opt into the proceedings from 2010

74

through 2016 as a prerequisite for having their rights adjudicated. Landowners assert that they presented undisputed — and, ultimately, stipulated — evidence showing that certain areas in the southern half of Costilla County were settled in the time of Gilpin. These were previously referred to as the Stipulated Settled Lands. Because timely settlement of these lands was undisputed, landowners argue that the *Lobato II* mandate required the trial court to identify all current owners of any such benefited lands and adjudicate their access rights, without requiring them to first come forward to assert a claim. We agree that the trial court's opt-in identification process was inadequate to discharge the mandate, at least with respect to the Stipulated Settled Lands.

### 1.  Additional Background

¶ 130  As described in Part I.C, *supra*, from 2004 through 2010, the trial court decreed access rights for the owners of lands identified in Map A and Book E (the opt-out process). Once the trial court had identified all owners of Map A and Book E lands and adjudicated their rights, it turned to the remaining portions of Costilla County. From 2010 through 2016, after providing all landowners in the southern half of Costilla County with notice by mail, the trial court

75

ultimately decreed access rights for the approximately 350 landowners who came forward and asserted claims (the opt-in process).

¶ 131  The procedural transition that occurred in 2010 coincided with the retirement of the then-presiding trial judge, Judge Gaspar Perricone.  Before his retirement, however, Judge Perricone recognized that Costilla County landowners located outside of Map A and Book E would need to present different evidence to meet their burden of proof because they could not rely on the presumption of timely settlement derived from Map A and Book E.  Judge Perricone also approved the parties' plan to begin the second phase by mailing notices to all landowners in the southern half of Costilla County advising each recipient of his or her right to come forward and participate in the proceedings.  Each notice required the landowner to respond within 120 days in order to make a claim, but stated that "[l]andowners will not lose their opportunity to establish access rights if they choose not to participate in the identification process."

¶ 132  In March 2010, Judge Kenneth Plotz replaced Judge Perricone as the presiding judge in this case.  In April 2010, Judge Plotz

authorized the mailing of 23,000 advisory notices to landowners in the southern half of Costilla County. Approximately 1200 landowners responded. Based on the responses received, the trial court subdivided the southern half of Costilla County into four regions and set evidentiary hearings for landowners from each region.

¶ 133 Soon thereafter, landowners' counsel gathered historical maps and other documentary evidence showing that specific areas in the southern half of Costilla County were settled by the time of Gilpin. Based on landowners' evidence, Ranch Owner stipulated that each such area was timely settled.[21]

¶ 134 From 2012 through 2014, Ranch Owner stipulated to the timely settlement of several towns, including Garcia, Los Fuertes, Old San Acacio, and Chama Canyon. In January 2015, Ranch Owner stipulated to a master map demarcating all known timely settled land in Costilla County, which we referred to earlier as the "Stipulated Settled Lands."

---

[21] Ranch Owner did not present any rebuttal evidence to dispute the timely settlement of any areas identified by landowners.

¶ 135    In 2013, once Ranch Owner stipulated that the town of Garcia was timely settled,[22] landowners from Garcia moved for the trial court to identify and decree rights for the owners of all land inside of Garcia's stipulated boundaries — including landowners who had not come forward to assert claims.  They argued that, by virtue of Ranch Owner's stipulation to Garcia's timely settlement, "[l]andowners in Garcia are in the same position as the owners of land shown on Map A and Book E."  They requested, therefore, that the trial court complete the identification process for Garcia by "identify[ing] the owners of the land within the stipulated area." They further argued that any process that required individual landowners to come forward and show that their land was located within Garcia's stipulated boundaries would discourage many Garcia landowners and impede finality.  The Garcia landowners requested that the trial court appoint Integrated Land Services[23] as a court-appointed expert witness, pursuant to CRE 706, "to identify

---

[22] Ranch Owner also stipulated that a 19th century ditch map introduced by landowners' counsel was the best available evidence of the area that was settled.
[23] Integrated Land Services is a surveying company that partnered with the San Luis Valley Geographic Information System (GIS) Authority to provide GIS services in San Luis Valley.

the specific lots and parcels of land within the stipulated boundary of the Garcia Settlement Map."

¶ 136   Ranch Owner opposed the requested identification process, arguing that the trial court was only required to decree rights for the nine Garcia landowners who had come forward after the 2010 advisory notices were mailed.  Ranch Owner further argued that the law of the case, as articulated by Judge Perricone, required a process whereby individual landowners must come forward to assert claims.

¶ 137   The trial court denied the Garcia landowners' motion.  It relied on an earlier description by Judge Perricone of how the second phase of the identification process should unfold, determining that Judge Perricone's statement constituted the law of the case.  Judge Perricone, at a February 2009 hearing, had advised the parties:

> We've been operating up to now on a presumption that I [Judge Perricone] have determined existed as a result of the Supreme Court decisions in reference to Map A, Book E, and the Beaubien document.  I think that presumption ends and the burden now rests with those people who want access.

¶ 138   Judge Plotz concluded that Judge Perricone intended to require any future landowner claimants to come forward and assert

claims, and that Ranch Owner would not be required to bear the cost of identifying benefited landowners who had not come forward. Specifically, with respect to Judge Perricone's February 2009 statement, Judge Plotz concluded:

> Put in context, by stating that the presumption ends, [this statement] means that landowners, such as those in the Garcia Township, may come to the trial court and assert those claims, but that since these landowners do not reside within the confines of Map A, Book E, the [Ranch Owner] Defendants are no longer under an order of the trial court to pay for a process which identifies all landowners in an area such as the Garcia Township.

¶ 139    The trial court concluded that "the law of this case holds that the Garcia Residents," because their land is "not identified in Map A, Book E," must "bear the burden of coming forward and proving" that their land was settled in the time of Gilpin.

   2.    The Opt-In Process Was Not Required By the Law of the Case

¶ 140    We conclude that the trial court erred in determining that it was bound by the law of the case doctrine to implement an opt-in process with respect to the Stipulated Settled Lands during the final phase on remand.  Pursuant to the law of the case doctrine, the trial court was bound to adhere to the *Lobato II* mandate but had

discretion to depart from statements made by the prior trial judge, Judge Perricone. In any event, Judge Perricone's statements did not preclude the trial court from adjudicating rights of all Garcia landowners, as they requested.

¶ 141 The law of the case doctrine does not demand strict adherence by a trial court to its own previous rulings. While the doctrine "generally requires the court to follow its prior relevant rulings," it is "merely discretionary when applied to a court's power to reconsider its own prior rulings." *Giampapa v. Am. Family Mut. Ins. Co.*, 64 P.3d 230, 243 (Colo. 2003); *see also Roybal*, 672 P.2d at 1005 n.5 ("[T]he law of the case as established by trial court rulings is not binding if it results in error or is no longer sound due to changed conditions . . . ."). Judge Perricone's statements were not elevated to the level of a mandate by his retirement. Insofar as his statements constituted the law of the case, their binding effect was the same as if they had been Judge Plotz's own statements.

¶ 142 Moreover, when a court reconsiders its own prior decision, "the only purpose of the doctrine is efficiency of disposition." *Roybal*, 672 P.2d at 1005 n.5. Because adherence to Judge Perricone's statement ultimately prevented the trial court from

fulfilling its mandate to "identify *all landowners* who have access rights to the Taylor Ranch," *Lobato II*, 70 P.3d at 1167-68 (emphasis added), the trial court could have and should have reconsidered whether the latter phase of the identification process should be structured as an exclusively opt-in process.

¶ 143   Even if Judge Perricone's statement was entitled to considerable deference under the law of the case doctrine, we conclude that it did not preclude the trial court from implementing an opt-out process to identify and decree access rights for the owners of lands that Ranch Owner stipulated were timely settled — including Garcia and any other unadjudicated lands within the Stipulated Settled Lands.  Importantly, the "presumption" Judge Perricone described in February 2009 was the presumption of timely settlement.  By observing that "the presumption ends," Judge Perricone recognized that Map A and Book E lands had been treated as presumptively settled, but landowners would need to present different proof of timely settlement for any lands outside of Map A and Book E.  But Judge Perricone did not prescribe a new process by which these non-Map A landowners' access rights should be adjudicated.  Rather, Judge Perricone's observation that

82

"the burden now rests with those people who want access" was an acknowledgment that landowners in later phases of the remand proceedings could not depend on the Map A and Book E presumption to meet their burden of proof on the issue of timely settlement, as landowners had done during the first phase. When Judge Perricone made this observation, landowners had not yet presented evidence showing that any areas of Costilla County outside of Map A were timely settled.

¶ 144    But by the time the trial court denied the Garcia landowners' motion in 2013, landowners had not only presented undisputed evidence that the town of Garcia was settled by January 1869, but Ranch Owner had also stipulated that Garcia was timely settled. Because Ranch Owner stipulated to Garcia's timely settlement, any Garcia landowners were entitled to access rights upon showing that their property was located inside the boundaries of the stipulated map of Garcia. *See Lobato II,* 70 P.3d at 1159 ("[L]andowners of Costilla County who are able to show that their property was settled during the time of Gilpin's ownership . . . will be granted access rights to the Taylor Ranch . . . ."). Thus, because Ranch Owner's stipulation satisfied landowners' burden to prove timely settlement,

it served the same evidentiary function as the Map A and Book E presumption referenced by Judge Perricone in February 2009. Indeed, Ranch Owner's stipulation obviated the need to apply a presumption of timely settlement at all. The stipulation rendered the presumption irrelevant.

¶ 145 Judge Perricone's statement that "the presumption ends," therefore, does not justify the trial court's implementation of an opt-in process for all non-Map A landowners. The trial court, in relying on this statement, appeared to conflate the presumption of timely settlement with the opt-out process itself. It reasoned that, "by stating that the presumption ends, [Judge Perricone] means that landowners, such as those in the Garcia Township, may come to the trial court and assert those claims." But Judge Perricone was merely observing that a presumption of timely settlement would not attach to non-Map A lands — unless and until timely settlement of any such lands was established through different evidence.

¶ 146 In summary, we conclude that the trial court mistakenly concluded that it was bound by the law of the case doctrine to implement an opt-in process with respect to the yet-to-be-

adjudicated Stipulated Settled Lands during the last phase on remand. In our view, Judge Perricone's statements did not preclude an opt-out process for all non-Map A lands, even assuming such statements were entitled to deference. Having concluded that Judge Plotz was not required to implement an opt-in process from 2010 through 2016, we now turn to the question of whether that process was consistent with the mandate.

### 3. The Mandate Requires Identification of All Landowners Within the Stipulated Settled Lands

¶ 147   As previously discussed, the supreme court's mandate required the trial court to identify "*all landowners* who have access rights to the Taylor Ranch." *Lobato II*, 70 P.3d at 1167-68 (emphasis added). Although the opt-in process implemented by the trial court from 2010 through 2016 resulted in access decrees for roughly 350 additional Costilla County landowners, the process was, almost by design, not comprehensive.

¶ 148   Ranch Owner's stipulations changed the complexion of the identification process on remand by creating a map of land that was, like Map A, accepted as being timely settled. By early 2015, Ranch Owner had stipulated to a master map of all Costilla County

85

land that was settled as of 1869 (the Stipulated Settled Lands). Thus, as the Garcia landowners argued below, any land within the boundaries of these stipulations became identically situated to the Map A and Book E land. In 2004, at the outset of the remand, the trial court decided that the most comprehensive and efficient result would be achieved by starting from the best evidence of timely settlement (Map A and Book E) and, with the help of an expert, identifying the current owners of the land therein. Once Ranch Owner stipulated that certain non-Map A lands were also timely settled, the trial court's calculus should have been the same as in 2004 — namely, it should have pursued an administrative process to identify the current owners of the Stipulated Settled Lands outside of Map A. As discussed above, Judge Perricone's February 2009 statements neither required nor supported a departure from the opt-out process. Instead, because the trial court could have identified all current owners of the Stipulated Settled Lands, the mandate required that that be done.

¶ 149    We cannot find any justification in the record for requiring landowners to come forward and assert individual claims in order to become eligible to access the Ranch, and the deficiencies of an opt-

86

in process under these circumstances are plain to see. As the trial court noted in its final order, the opt-in process left the owners of certain benefited lands unidentified. For example, although Ranch Owner stipulated the Garcia Township was timely settled — entitling Garcia landowners to access rights unless barred by res judicata — only nine landowners responded to the 2010 advisory notices and came forward to assert individual claims. In 2014, landowners' counsel persuaded an additional six Garcia landowners to submit affidavits describing their ownership of land within the stipulated boundary. Counsel noted, however, that other Garcia landowners who had expressed interest in asserting a claim had never followed through by providing executed affidavits. Ranch Owner stipulated that the fifteen Garcia landowners who submitted affidavits were entitled to access the Ranch, and the trial court decreed access rights for them on that basis. Ranch Owner later stipulated that landowners from other areas within the Stipulated Settled Lands were also entitled to access rights based on similar affidavits.

¶ 150    We conclude that, while Ranch Owner's stipulations to access rights for some landowners within the Stipulated Settled Lands

87

partially remedied the incompleteness of the trial court's opt-in process, neither landowners nor their counsel should bear the burden to identify all Costilla County landowners with access rights to the Ranch. Instead, the supreme court's *Lobato II* mandate specifically directed the trial court to perform that identification, with costs to be paid by the Ranch Owner. 70 P.3d at 1167 ("Because the plaintiff landowners have prevailed on their claims, Taylor now must pay the costs associated with identifying and notifying all persons who have access rights to the Taylor Ranch.").

¶ 151 For these reasons, we conclude that the opt-in process by which the trial court adjudicated landowners' access rights from 2010 through 2016 was insufficient to discharge its mandate. Because the trial court could have comprehensively identified all benefited Costilla County landowners but did not do so, we conclude that further proceedings are required.

### 4. Remand Instructions

¶ 152 We remand the case for the trial court to identify and decree rights for all persons who own property within the boundaries of the

Stipulated Settled Lands.[24]  Landowners are not required to come forward in order to have their rights adjudicated.

¶ 153    We anticipate that Ranch Owner's concerns regarding finality will arise again once access rights for the owners of the Stipulated Settled Lands have been adjudicated.  Once the current owners of the Stipulated Settled Lands have been identified and their access rights adjudicated, Ranch Owner may elect at that time to personally serve all remaining Costilla County landowners whose rights have not been adjudicated.  Such notice should advise landowners that they must make a claim for access within a reasonable time as determined by the trial court or be forever barred from making a claim.  Ranch Owner must bear the cost of personal service if that election is made.  *Lobato II*, 70 P.3d at 1167 ("In light of our holding that Taylor failed to exercise reasonable diligence in personally naming and serving all reasonably ascertainable individuals with an identifiable interest in the Taylor Ranch, the cost of remedying this failure on remand must be borne by Taylor.").  Once personal service on all remaining Costilla County

---

[24] These landowners will be subject to the same res judicata defense as the Map A and Book E landowners.

landowners has been attempted, Ranch Owner may then serve any unknown, unidentified persons through publication in order to bring finality to the action. If, on the other hand, Ranch Owner elects not to attempt personal service on nonadjudicated landowners, then such landowners with unadjudicated rights remain free to come forward at some later date.

### III.   Conclusion

¶ 154    For the reasons set forth in this opinion, we affirm the trial court's orders decreeing access rights for Costilla County landowners. We reverse the trial court's October 2016 order to the extent it requires any remaining Costilla County landowners entitled to access the Ranch to come forward to assert individual claims, and we remand for the trial court to identify and adjudicate access rights for any yet-unidentified persons who own property within the Stipulated Settled Lands, consistent with this opinion.

JUDGE WEBB and JUDGE HARRIS concur.